YALE UNIVERSITY *vs.* THE TOWN OF NEW HAVEN.

Third Judicial District, Bridgeport, Oct. Term, 1898. ANDREWS, C. J., TORRANCE, BALDWIN, HAMERSLEY and HALL, JS.

Section 3820 of the General Statutes provides, among other things, that "buildings or portions of buildings exclusively occupied as colleges, academies, churches, public school-houses, or infirmaries," shall be exempt from taxation. *Held* that under this provision,—which did not create a new form of exemption but merely declared the well-settled and long-established policy of this State in dealing with such property,—buildings of Yale University which were occupied exclusively as dormitories and dining-halls by its students, were non-taxable.

In 1834 an amendment (1 Private Laws, 481 ; General Statutes, § 3822) of the plaintiff's charter exempted from taxation all funds which had been given and might thereafter be given to the college and invested and held for its use, but provided that it should never hold real estate in this State, free from taxation, which afforded an annual income of more than $6,000, and that the private property of the officers of the college should not be exempt. *Held* that the first clause of the Act plainly exempted all of the property of the college from taxation, while the *proviso* qualified this total exemption only for the purpose of imposing a limited restraint upon investments in real estate ; that the fees of students, whether apportioned as room rent or tuition, could not be treated as income of real estate, and that land occupied and reasonably necessary for the plant of the college was not income producing real estate within the meaning of the *proviso.* *Held,* also, that vacant lots owned by the plaintiff were exempt from taxation, and dwelling-houses and factories as well, unless the latter, or some of them, might become taxable because the rents derived therefrom carried the plaintiff's annual income above the prescribed limit.

Real estate which is held in the name of the plaintiff but is substantially owned and enjoyed by one of its professors, is taxable and should be included in its list.

The plaintiff's charter does not exempt from taxation property which is held by it for any private use, nor does it authorize commercial dealings with its exemptions, whether by way of mere speculation in vacant lots, or of selling land on long leases at nominal rents, or otherwise.

Argued October 25th, 1898—decided January 4th, 1899.

APPEAL from the doings of the board of relief of the town of New Haven, taken to the Superior Court in New Haven County and referred to a committee by whom the facts were found and reported; the court, *Roraback, J.*, accepted the committee's report and with the consent of the parties reserved the case for the consideration and advice of this court. *Judgment for plaintiff advised.*

The case is sufficiently stated in the opinion.

*Charles R. Ingersoll* and *Henry Stoddard*, with whom was *Louis H. Bristol*, for the plaintiff.

The court will so construe § 3820 as to promote the policy of the State and the manifest purpose and intent of the legislature. *People* v. *Tax Com'rs*, 11 Hun, 505; *New York Infant Asylum* v. *Westchester*, 31 id. 116; *In re Miller*, 45 id. 244; *Brown University* v. *Granger*, 19 R. I. 704; *People* v. *Barbour*, 42 Hun, 27; *Griswold College* v. *Iowa*, 46 Iowa, 275; *State* v. *Ross*, 24 N. J. L. 497. The reason for treating this institution in an exceptional manner is that it contributes to the welfare of the State. Its function is largely a public function. Its work is done primarily, indeed, for individuals, but ultimately for the public good. Other communities pay large sums to secure the presence of a lunatic asylum, a jail or a state prison; but the assessors of New Haven would strip this venerable seat of learning of an exemption for which it returns, in mere money value, a twentyfold equivalent. Courts of justice, should occasion require, would be astute in finding reasons to defeat so inequitable a result. The plaintiff's buildings are within the statutory exemption. This appears from a consideration of Colonial

and State legislation in reference to the exemption claimed;
from the construction given to that legislation by the uni-
form and universal practice of the Colony and State for
nearly two centuries; from the nature and character of the
work authorized by the plaintiff's Acts of incorporation, and
of the means and methods necessary to carry into effect the
objects and purposes of said Acts; from the significant fact
no reported case can be found where an attempt, even, has
been seriously made to subject "a college building" to tax-
ation; from the overwhelming weight of authority, as shown
by the decisions in analogous cases.   Gen. Stats. Rev. 1702,
Rev. 1750, p. 108, Rev. 1784, p. 111, Rev. 1796, p. 252, Rev.
1808, p. 433; Pub. Acts, 1802, p. 25; Comp. of 1838, p. 602;
Rev. 1849, pp. 603, 604; Pub. Acts, 1851, pp. 51, 52; Rev.
1866, p. 707; Rev. 1875, p. 154; Rev. 1888, § 3820.   The
specific legislation shows the same favor to the plaintiff.   See
charter of 1745; Acts of 1799; Acts of 1816.   The practical
construction given to this legislation appears from the fact that
prior to October, 1896, none of the buildings mentioned in the
first of the reasons of appeal were ever in fact taxed or set
in the list of New Haven, or elsewhere for that purpose.   The
controlling force of such long continued and universal prac-
tice is a matter of elementary law.   *Yudkin* v. *Gates*, 60 Conn.
429.   The buildings sought to be taxed are, in the most re-
stricted and appropriate sense of the words, exclusively
occupied as " colleges," as no other buildings are or can be.
6 Ency. Brit. (9th ed.) p. 142.   It is an important fact that
this is the first serious attempt to subject a college dormitory,
so-called, to taxation; and the following decisions are con-
clusive against the success of the attack.   *State* v. *Ross*, 24
N. J. L. 497; *Northampton County* v. *Lafayette College*, 128
Pa. St. 132; *House of Refuge* v. *Smith*, 140 id. 387; *Ramsey
County* v. *Macalester College*, 51 Minn. 437; *Griswold College*
v. *Iowa*, 46 Iowa, 275; *Detroit, etc., School* v. *Detroit*, 76 Mich.
521; *Davis* v. *Camp Meeting Asso.*, 49 N. E. Rep. (Ohio) 401;
*Wesleyan Academy* v. *Wilbraham*, 99 Mass. 599; *Mass. Gen.
Hosp.* v. *Somerville*, 101 id. 319; *Mt. Hermon Boys' School* v.
*Gill*, 145 id. 139; *People ex rel., etc.,* v. *Com'rs of Taxes*, 6 Hun,

109, 64 N. Y. 656 ; *People ex rel., etc.,* v. *Barbour,* 42 Hun, 27 ; *Willard* v. *Pike,* 59 Vt. 202. The amount received by the plaintiff for the use and occupation by its students of living, study and sleeping rooms, is not income within the meaning of the Act of 1834 and of § 3822 of the General Statutes. *West Hartford* v. *Water Com'rs,* 44 Conn. 360. What the student pays is not rent in any technical sense, for by no stretch of language can they be said to be tenants, in the ordinary acceptation of the term. *State* v. *Ross, Ramsey County* v. *Macalester College, supra ; First Unitarian Soc.* v. *Hartford,* 66 Conn. 368. The amounts received for the use and occupation of said rooms, are not a means of profit to the funds of the institution. *Epis. Acad.* v. *Phila.,* 150 Pa. St. 565 ; *Gooch* v. *Asso.,* 109 Mass. 558 ; *McDonald* v. *Mass. Gen. Hosp.,* 120 id. 432.

*John W. Alling* and *William B. Stoddard,* with whom were *Jacob P. Goodhart* and *William H. Ely,* for the defendant.

All of the property in dispute is taxable, both under the charter of the University and the statute laws of the State. There is nothing in the charter of 1701 which exempts or attempts to exempt the estate of the University from taxation. The charter of 1745 removes the limitation to hold property provided by the Act of 1701, and for the first time exempts college property from taxation. But the only exemption from rates or taxes was based solely upon the amount of yearly value (which we assume to mean yearly income). It does not exempt the building because it is occupied as a college, or because it is owned by and used exclusively for scientific, literary, benevolent or ecclesiastical societies. It does not exempt property that is non-income producing. The amendment of 1834 simply increases the exemption from the yearly value of £500, to the right to hold real estate affording an annual income of not more than $6,000. It also exempts from taxation other funds, absolutely. The charter and the statute laws should be strictly construed. *Gillette* v. *Hartford,* 31 Conn. 357 ; *Hartford* v. *Hartford Theological Sem., supra ; Brainard* v. *Colchester,* 31 id. 410. The dormitories.

so-called, are not exempt under § 3820 of the General Statutes. The statute does not provide that buildings used for the benefit or promotion of the college, or for the accommodation or benefit of students, or for dining-rooms or sleeping rooms for students, shall be exempt from taxation. The statute does not say that when the income is used for the benefit of the University or for the benefit of the students, it shall not be taxed. The exemption is limited to property exclusively occupied as colleges. The dormitories are not exclusively occupied as colleges. They are unfitted for any other use or purpose than that to which they are at present devoted, to wit: as sleeping, study and living rooms for the use of students. It appears from the finding and term bills that these dormitories are rented, and that the net income compares favorably with ordinary investments of like character. The result of the investments in these buildings shows that the University has made a safe and profitable business transaction. The following cases sustain our claim, that the above property is not exempt from taxation. *Cincinnati College* v. *State*, 19 Ohio, 110 ; *New Haven* v. *Sheffield Scientific School*, 59 Conn. 166 ; *Manresa Inst.* v. *Norwalk*, 61 id. 228 ; *University* v. *People*, 99 U. S. 309 ; *Hartford* v. *Hartford Theological Sem.*, 66 id. 475 ; *Gibbons* v. *Columbia*, 116 U. S. 404 ; *Williams* v. *Williamstown*, 167 Mass. 503 ; *Williams, etc., Acad.* v. *Exeter*, 58 N. H. 306 ; *St. Joseph's Church* v. *Providence*, 12 R. I. 19 ; *Griswold College* v. *State*, 46 Iowa, 275 ; *Gillette* v. *Hartford*, 31 Conn. 351 ; *Conn., etc., Asso.* v. *East Lyme*, 54 id. 152 ; *Chapel, etc.*, v. *Boston*, 120 Mass. 212. The dining-hall is assessed at $8,100. The business carried on in it yields a profit equivalent to the interest upon $10,000, the cost of the equipment, and an additional amount for a sinking fund. There are two items of property about which no question can be made : the first relates to the residence occupied by Prof. Brown, assessed at $15,078 ; the second relates to three lots on Howe street, assessed at $3,165. Did we have no statutes exempting from taxation, but in place thereof had statutes directly appropriating the money of the State, city or town for the benefit of these

institutions, there would be no doubt but that they would receive a very strict construction. It is not any excuse to an assessor for failure to discharge his duty, that his predecessors in office failed to discharge their duties. Furthermore, the rights of the public cannot be waived or affected by omission to assess property which ought to be assessed, no matter for how long continued. Before any construction of the statutes in question can be claimed by force of alleged acquiescence, it must be shown that the assessors knew of the facts which exposed the property of the appellant to taxation. *King* v. *Hogg,* 1 T. R. 721; *Dwight* v. *Boston,* 12 Allen, 316; *Landon* v. *Litchfield,* 11 Conn. 263.

HAMERSLEY, J. In 1887 the corporation of the President and Fellows of Yale College in New Haven was authorized to use the title "Yale University," and gifts received and contracts made under either of said names were declared to be valid. The powers of the corporation were not otherwise changed. 10 Special Laws, 467.

In October, 1895, the University filed with the assessors of the town of New Haven a list of the property owned by it subject to taxation for the year 1896. The list contained seven pieces of land valued at $57,680. To this list the assessors added certain buildings used for dormitories and dining-hall, with the land on which they stood, valued at $214,990; and also added certain vacant building lots, dwelling-houses and factories, valued at $167,112. The plaintiff appealed to the board of relief, which confirmed the action of the assessors. This appeal is an application to the Superior Court, alleging that the board of relief acted illegally in confirming the action of the assessors, and praying for appropriate relief.

The alleged illegality depends on the meaning given to two statutes, *viz.,* § 3820 of General Statutes, and the Act of 1834 amending the charter of the College, which appears also in § 3822 of the General Statutes.

*First.* Section 3820 of the General Statutes provides that " buildings or portions of buildings exclusively occupied as

colleges, academies, churches or public school-houses or infirmaries," shall be exempt from taxation. If buildings used by the College exclusively as dormitories and dining-halls for its students, are buildings exclusively occupied as a college, then the action complained of in adding to the list dormitories and dining-hall, was illegal; if such use is not a college occupation, then said action was legal.

The word "college," used to denote a constitutent of or the equivalent of " university," has acquired a definite meaning. As first used " college " indicated a place of residence for students, and occasionaly an " universitas " or " studium generale." The expressions " universitas studii " and " universitatis collegium," occur in early official documents. A suggestion of the modern university appears in the college and library of Alexandria founded and endowed by Ptolemy Soter. Here the Museum provided, from the first, lodgings and refectory for the professors, and later similar provisions were made for the students. A writer of the 12th century speaks of the " handsome pile of buildings, which has twenty colleges whither students betake themselves from all parts of the world."

The university in Europe developed about the year 1200. It was a community organized for the study of all branches of knowledge and authorized by Pope, King or Emperor to confer degrees upon those found competent to instruct others. At Bologna, perhaps the earliest organized university, we find colleges almost from the beginning. Such college was a separate house with a fund for the maintenance of a specified number of poor students. Similar colleges existed in Paris, Oxford and other universities. At first little more than lodging rooms and refectory, they grew, especially in England, to be the home of the students for all purposes. The instruction and discipline of the university was through the colleges. The conditions of the early universities were peculiar. Vast throngs of students were gathered at one place; they were divided into " nations," each, as at Paris, with its own proctor or procurator; they were further divided among faculties each with its dean. The divisions into nations and faculties were

cross divisions; and another cross division was that into colleges and halls (hall sometimes meaning an unorganized college, and sometimes used as synonymous with college). With changes in conditions, the college was largely eliminated from the continental universities, while in England the university became practically the associated colleges. Merton College, Oxford, founded in 1264, was the prototype of the English college. That college consisted of the chapel, refectory and dormitories. Here the scholars called fellows, in token of the spirit of equality and companionship, lived under one government, educational and moral, and prepared to take the degree granted by the university. As the colleges increased all non-collegiate students were driven away. The vagabonds or chamber-dekyns, *i. e. camera degens*, living in lodgings as opposed to those who lived in a college, disappeared. Each student in a college must belong to the university, and each student of the university must be attached to a college. And the heads of the colleges administered the university. Thus was developed the English theory of the university, where the honors and influence of the *studium generale* are gained and enjoyed by students living and working under the government of their respective colleges. As Newman says, the university to enforce discipline developed itself into colleges, and so the term college "was taken to mean a place of residence for the university student who would there find himself under the guidance and instructions of superiors and tutors, bound to attend to his personal interest moral and intellectual." (See passim, Vol. 3, Newman, Hist. Sketches; Lyte's History of University of Oxford; Vols. 1 and 2 Huber's English Universities; Ency. Brit., University.) The college and university however were sometimes united in one corporation. Newman says, "The University of Toulouse was founded in a college; so was Orleans." Trinity College, Dublin, styled in its charter (1591) "The College of the Holy undivided Trinity of Queen Elisabeth near Dublin," is both university and college. It was founded by the Queen as a "*mater universitatis;*" but the hope was not realized and the university and college have ever since re-

mained one, called in common speech indiscriminately "Trinity College, Dublin," "Dublin University," "The University of Trinity College, Dublin." Marischal College, Aberdeen, was founded in 1593 as a college and a university, with power of conferring degrees. And so at the beginning of the 17th century the students of an English university lived in colleges, were instructed and governed through colleges, whether the university included a number of colleges or a single college; and among the buildings indispensable for every college were the great hall or dining-room, and the living rooms or dormitories.

In establishing universities in the new world, the limitations of the people compelled the founders to follow the example of Trinity College, Dublin, and Marischal College, Aberdeen, and not that of Oxford and Cambridge. Upon the same corporation was conferred the power of the university in granting degrees, and of the college in government; and such community and the buildings required for its use were known as " the College."

The first appropriation to endow a "University" in Virginia, was made in 1607. In 1660 an Act of the colonial legislature endowed "the College," and in 1693 William III. established the University, described in the charter as " a certain place of universal study or perpetual college of divinity, philosophy, languages and other good arts and science," and named it "The College of William and Mary in Virginia."

The settlers of New England early felt the need of a local university, and the first step was the erection of a college, i. e. a building where the students were to be lodged, fed and instructed while pursuing the university studies and qualifying for its degrees. In 1630 the General Court at Boston advanced £400 for this purpose, and subsequently appointed Newtown as the seat of the university, and for this reason changed the name of the town to Cambridge. 2 Mather's *Magnalia*, pp. 7–9, 19, 20; Quincy's *Hist. of Harvard*. In 1642 the court established overseers of "a College founded in Cambridge," and in 1650 the charter

was granted. The statutes immediately adopted, provided that all students admitted to the college "must board at the Commons," and also provided for conferring the first and second degrees in arts. While the college exercised some of the privileges of a university, doubt was felt as to the power of the General Court to confer such privileges. The colonial charter of 1692 was construed as authorizing the court to erect a university, and immediately, as Mather says, the General Assembly granted "a charter to this University," authorizing it to grant degrees "as in the Universities in England." This charter expired within three years, from failure to receive the royal approval, and the college was subsequently reorganized under the charter of 1650. The degree of D. D. was conferred by the College in 1693 on Increase Mather, its president, who, in conferring the degrees at the first commencement after the new charter, maintained that "the right of establishing universities, (*academias*) is reserved to all those, and to those only, who hold the sovereignty in the State," and that the General Court, under the charter of 1692, possessed such sovereignty. No other degree of doctorate was conferred until 1771, when Nat'l Appleton was made doctor of divinity; and a few years later George Washington was made doctor of laws. The Massachusetts Constitution of 1779 recognized "The University at Cambridge," and ratified and confirmed all the rights and privileges it had been accustomed to exercise.

The Colonies of Connecticut and New Haven were at first unable to erect a college by themselves, and for some years contributed to that of Cambridge. The plan of a college at New Haven was early mooted, and in 1654 steps were taken towards its consummation. Davenport wished to direct the benefaction of Governor Hopkins to the founding of a college, and the court of that Colony acceded to that plan. The difficulties attending the union of the Colonies of New Haven and Connecticut obstructed the execution of the plan, and eventually the funds were appropriated to the Hopkins Grammar School. In 1698 the plan was revived, and ten of the principal ministers agreed to stand as trustees to found, erect

and govern a college.   They formed themselves into a society
at New Haven in 1700, and the same year, at a meeting at
Branford, they (in the language of Trumbull) "founded
the University of Yale College." 1 Trum. *Hist. of Conn.*
402.   In 1701 the General Court of Connecticut granted to
said trustees the privilege of founding, endowing and order-
ing a "Collegiate School," and authorized them to acquire
and hold real estate not exceeding the value of £500 per
annum, and personal property to any amount, for the use of
said school and for erecting and endowing the same.   4 Col.
Rec. 363.   The Act did not purport to establish a college and
university, unless by indirection ; but the trustees, following
the example of Harvard, proceeded at once to grant degrees
in arts.   Until 1716 the school was migratory ; the trustees
then decided that it should be established at New Haven, and
this decision was confirmed by the legislature the following
year.   6 Col. Rec. 30.   In pursuance of this authority, aided
by appropriations by the colonial government, as well as by
gifts from Governor Yale and other benefactors, a college
house "for the entertainment of the scholars " was so far
finished in 1718 as "to be fit for the reception and accom-
modation of all the students."   It contained nearly fifty
studies and was furnished with a convenient hall, library
and kitchen.   At the commencement for that year, in the
presence of the authorities of the Colony, the trustees did,
"with one consent agree, determine and ordain that our Col-
lege House shall be called by the name of its munificent patron,
and shall be named YALE COLLEGE."   2 Trum. *Hist. Conn.*
11.   In 1745, under the energetic rule of President Clapp, a
body of statutes was drawn up, derived partly from the laws
and customs of the College, partly from the laws of Harvard,
and partly from the University of Oxford ; and the same year
the General Court assuming the right of exercising within
its jurisdiction the powers of sovereignty belonging to an
independent government, not inconsistent with express stat-
utes of England, which it always claimed, though with much
fear and trembling and with great caution, granted a charter
somewhat like in form to a royal patent, erecting a corporate

university and college under the name of "The President and Fellows of Yale College in New Haven," endowing it as university and college with the power of self-government and of making all reasonable laws and ordinances for that purpose, and with the power of conferring all such degrees as are usually given in colleges or universities, and with the power to appoint a scribe or register, a treasurer, tutors, professors, steward, and all such other officers and servants usually appointed in colleges or universities for the promotion of good literature, and for the well ordering and managing the affairs of said College.　It is plain that the College thus erected involved, as an essential feature, the education and government of university students in college houses under college officers. The "Colleges or Universities" referred to in the charter were the universities in England administered by associated colleges, or the single colleges endowed with the privileges of a university.　In both, the "College" involved, necessarily, buildings for the residence and entertainment of the officers and students.　The General Court again and again contributed to the erection of such buildings.　When in 1753 the trustees of the College of New Jersey (now Princeton University) applied to the General Assembly of Connecticut for leave to set up a lottery to raise money "to build a public house for entertaining the students and better answering the good ends designed in founding and erecting said college," the Assembly granted the liberty, "on consideration of the matters in said petition, and for the encouragement of religion and learning."　10 Col. Rec. 217.　The "College" and the buildings for entertaining the students under college government, were inseparable.　In 1818 Yale College consisted of three college buildings for housing the officers and students, a lyceum, a chapel, a kitchen and large dining-room; and it was this college whose charter was confirmed by our Constitution of 1818.

The settled meaning of "College" as a building or group of buildings in which scholars are housed, fed, instructed and governed under college discipline, while qualifying for their university degree, whether the university includes a number

of colleges or a single college, is now attacked. We have deemed it proper to trace this meaning with sufficient detail to demonstrate the utter unreason of the attack. This peculiar function of a college is inherent in the best conception of the university. This meaning has been attached to the English word for 800 years; it was the only meaning known at the time our first American colleges were founded, it was recognized and distinctly affirmed in the charter of Yale College, it has since been affirmed by repeated Acts of legislation, and has received the sanction of constitutional confirmation. It was impossible for the legislature to express its meaning more clearly than in the language of § 3820: "Buildings occupied as colleges." If it had been said: "Dormitories, dining-halls and other buildings occupied as colleges," the meaning would have been the same, and the amplification would have added nothing to the precise certainty of the language used. *State* v. *Ross*, 24 N. J. L. 497; *Northampton County* v. *Lafayette College*, 128 Pa. St. 132; *Ramsey County* v. *Macalester College*, 51 Minn. 437; *Griswold College* v. *Iowa*, 46 Iowa, 275.

The fact that certain sums are paid for use of the rooms occupied, does not alter the character of the occupation. A church is none the less a church, because the worshippers contribute to the support of services by way of pew rent. A hospital is none the less a hospital, because the beneficiaries contribute something towards its maintenance. And a college is none the less a college, because its beneficiaries share the cost of maintenance; and it is immaterial whether such contribution is lumped in one sum, or apportioned to sources of expense, as tuition, room rent, lecture fee, dining-hall, etc.

The defendant further claims that even if some dormitories may be occupied as a college, yet § 3820 must be construed strictly, because it is a statute exempting property from taxation, and that so construed, the finding of the committee requires the court to hold that the dormitories assessed are not in fact buildings erected for the use of students, but in substance constitute an investment in the business of furnishing apartments for rich men at highly remunerative

rates, and that the student, as a student, is in fact and by the very necessity of the case excluded from any occupation of the buildings ; and therefore, upon the principle laid down in *Sunday School Union* v. *Philadelphia,* 161 Pa. St. 307, 315, 316, "if such institution sees fit to engage in trade for the purpose of increasing its revenue, or making any part of its business 'self-supporting,' the trade part of its business can be taxed, and ought to be." *Cincinnati College* v. *State,* 19 Ohio, 110.

Neither contention is correct. The rule that laws exempting property from taxation should be strictly construed, is well-settled and is based on solid reason. But it is often referred to, and several times in our own reports, in cases where it has no application and is not in fact applied. *Gillette* v. *Hartford,* 31 Conn. 351, 357 ; *Brainard* v. *Colchester,* ibid. 407, 410 ; *First Unitarian Society* v. *Hartford,* 66 Conn. 368, 374 ; *Hartford* v. *Hartford Theological Seminary,* ibid. 475, 482. The last two cases mark the distinction in treating a mere charter exemption, and a statute declaring public buildings non-taxable. The rule is limited by the reasons which brought it about. These are two : exceptions to a general rule should be distinctly stated ; private privileges are obnoxious to the law and must be clearly expressed. The rule in truth is based on a presumption of intention ; the legislature ordinarily intends its laws to apply to all equally ; it does not intend to grant privileges to select individuals. So when exceptions or special privileges are claimed under a statute, this ordinary or presumptive intention is entitled to weight, according to the circumstances, in ascertaining the actual intention expressed by the language used.

These reasons do not fully apply to the law under discussion. The non-taxation of public buildings is not the exception but the rule. The corporations, whether municipal or private, which own and are by law charged with the maintenance of such untaxed buildings, are not the recipients of special privileges, in any sense obnoxious to the law. This clause of § 3820 does not exempt any individuals from the burden of taxation that is common to all ; it does not grant

to one, particular privileges denied to all others; it declares that lands and buildings sequestered to certain public uses, *i. e.* taken out of the body of private property and devoted exclusively to the common good, from which no individual can derive any profit, are not taxable property. And this has been, not the exception, but the rule from the foundation of our government. The seats of government, State or municipal, highways, parks, churches, public school-houses, colleges, have never been within the range of taxation; they cannot be exceptions from a rule in which they were never included. Our theory of taxation was laid down in the Code of 1650, and has not been changed, except so far as the *corpus* rather than the revenue of the estate may have become the basis of assessment. "Every inhabitant shall contribute to all charges both in church and commonwealth whereof he doth or may receive benefit, . . . proportionably to his ability;" his ability to be determined by his occupation and the amount of his ratable or taxable estate. It is the person enjoying the benefits of government who is taxed according to his ability. The mere stuff of land and buildings is not the subject of taxation, except as it may be the source of profit, present or prospective, to some person bound to contribute to the charges of government. And this same Code compelled each town to tax itself for the support of schools, that youths might "be fitted for the University," and appointed Commonwealth collectors to demand of every family gifts for the maintenance of scholars at Cambridge. 1 Col. Rec. pp. 547, 555. Buildings erected by means of such taxes and gifts were not a source of profit to any person; towns and trustees charged with the maintenance of such buildings were contributors to the public benefit rather than recipients. So these public buildings were not taxed; they were not exempted, because they had not been within the range of taxation; they were simply not mentioned in our tax laws.

It was different with exemptions in the more strict sense. The polls and estates of individuals were from time to time exempted; in 1667 those of commissioners or magistrates in the plantations were so exempted, and a like exemption was

tendered Winthrop to induce him to accept the appointment
of Governor.    2 Col. Rec. 59, 64.    In 1699 the estates of set-
tled ministers were exempted from paying rates, and in 1703
the polls of students at the Collegiate School were exempted.
4 Col. Rec. 287, 440.    And many like exemptions occur.
When the legislature in 1702 adopted our statute of charita-
ble uses, it not only secured the perpetuation of gifts for
pious uses according to the intent of donors, but also declared
that estates so given shall be "free from payment of rates."
This was an exemption of a very wide range and somewhat
uncertain description.    The language is perhaps broad enough
to cover some public buildings which previously had been
and afterwards remained untaxed because of the nature of
the property and not by reason of special legislative excep-
tion ; but the main purpose of this declaration of exemption
related to productive funds, lands or personal estate, given
for charitable uses, possibly with special reference to the
gifts of Hopkins, Gibbons, and Talcott, which had recently
come into use for the support of grammar schools, to antici-
pated gifts for the support of the "Collegiate School" and
to appropriations made for payment of ministers' salaries.
4 Col. Rec. 31 ; *Atwater v. Woodbridge*, 6 Conn. 223, 227.
And so we find that subsequent laws of taxation except as
exempt from payment of rates, not only prior personal ex-
emptions, but "in like manner all lands in this Colony se-
questered to or improved for schools and other pious uses";
8 Col. Rec. 133 ; and that this special exemption in the same
words continued until 1821, when the Act of 1702 was
changed by the omission of the tax exemption.    Since then
the only exemption from taxation of funds given for "pious
uses," is to be found in special charters, or in general acts
passed from time to time.    But public buildings, whether
belonging to the State or to some trustee appointed by the
State, occupied as colleges, school-houses and churches, were
not specially named in the tax laws as exempted, because
they were not included in "ratable estate" as taxable prop-
erty.    When the legislature in 1822 saw fit to formally de-
clare that property of the United States, of the State, and of

municipal governments, and "the buildings occupied as colleges," etc., should be exempt from taxation (Public Acts of 1822, p. 35), it did not alter the character of the property, or the reason of its not being taxed. The declaration was not an exemption, in the strict sense of the word, as to buildings occupied as colleges and schools, any more than as to property of the United States. They were untaxed, as they had been for nearly two hundred years without any legislative declaration, because they are not "ratable estate"; because they had been placed in that class of property which ought not to be taxed, by virtue of a public policy too clear to be questioned, and which had been followed without any specific legislation by our government from its very beginning.

The reason of such a public policy is apparent. The principle that property necessary for the operation of State and municipal governments, and buildings occupied for those essential supports of government, public education and public worship, ought not to be the subject of taxation, has been with us accepted as axiomatic. It has been incorporated into the constitutions of several States. It has been inseparably interwoven with the structure of our government and the habits and convictions of our people, since 1638. It is not based merely on the theory of the general benefit resulting from an increase of pious uses. All exemptions imply some public benefit; otherwise they are invalid. It is not merely an act of grace on the part of the State. It stands squarely on State interest. To subject all such property to taxation would tend rather to diminish than increase the amount of taxable property. Other conditions being equal, the happiness, prosperity and wealth of a community may well be measured by the amount of property wisely devoted to the common good in public buildings, parks, highways, and buildings occupied as colleges, school-houses and churches. To tax such property would tend to destroy the life which produces a constant increase of taxable property as well as some benefits more valuable. It is a misnomer to call the non-taxation of such property an exemption in favor of the governmental agency in which the legal title is vested. When

sequestered to such public use, the whole property by that act—equivalent to a single taxation to the extent of confiscation—passed out of the domain of private property, lost all value as ratable estate, and became incapable of measuring the ability of any person to contribute to the charges of the Commonwealth whereof he receives the benefit. These are, in brief, the positions which the history of Connecticut shows to have been the foundation of our revenue laws.

This clause of § 3820 is not strictly so much an exemption from taxation, as the declaration of a public policy well-settled and long established; it must therefore be construed reasonably so as to give full effect to the policy declared, as well as to avoid abuse and frustrate evasion.

The argument urged by the defendant in support of its claim that the dormitories assessed are practically used for the purposes of trade, is substantially this: The College is intended primarily for scholars who are poor, and the great majority of foundations express this purpose more or less clearly; no one shall be prevented by limitations of birth or means from the full development of his capacities for the service of the State; an essential feature of the College is equality; no special privileges nor honors can be secured except through personal worth. When, therefore, in the apportionment of rooms the students are practically divided on the right hand and left according to the marks of wealth, and, as the finding shows, the poor student is relegated to the unsightly discomfort represented by seventy-five cents a week and the rich student promoted to the comparative luxury represented by ten dollars a week, a rule of apportionment is adopted which violates the essential conditions of college life, and the buildings or portions of buildings appropriated to the rich students cease to be college buildings, because the average student is excluded from their occupation. There would be force in this argument, so far as it is supported by facts, if addressed to the college authorities. We do not care to minimize its force for that purpose; it goes without saying that the most costly gifts cannot compensate for any loss of that spirit of independent equality which is the life of the

University, and which has heretofore especially characterized this plaintiff. But the argument does not touch the essential contention that the dormitories are used for trade and not as college buildings. The committee finds that these buildings "are occupied by students of the College as study and living rooms, under the supervision and management of college officers resident therein for that purpose;" and that they "are unfitted for any other use or purpose." And such is admittedly the fact. This is conclusive. The criticism of the defendant goes deeper, and claims that the rules for ordering the occupation of college buildings tend to the perversion of the purpose of the College. But the power to make these rules is vested in the trustees by the charter; wise or unwise, they are an exercise of charter power. As to their effect thus far, the committee finds that the corporation administers a college within the true intent and meaning of its charter, "wherein all such persons of good moral character as desire to avail themselves of its advantages, irrespective of nationality, domicil, color, creed, or religious belief, are, at a moderate cost, to the number of about 2,500 annually, instructed in the arts and sciences." There are no special facts found necessarily inconsistent with this conclusion. We are not now, therefore, called upon to decide whether a complete perversion of college purpose involves a forfeiture of college rights.

All the dormitories occupied by students, the building used as a dining-hall, the observatory buildings, the two houses furnished by the College for the officers of the observatory, the adjoining land found to be reasonably necessary for the purposes of the observatory, and No. 121 Elm street, used as a college yard in connection with the college buildings, are non-taxable property under § 3820.

Some suggestion was made in argument, that this section might include buildings occupied but not owned by the College; we do not admit this interpretation, but express no opinion, as the question is not involved in this case.

*Second.* The Act of 1834 amending the charter of Yale College is as follows: "That the funds which have been, or may hereafter be, granted, provided by the State of Connec-

ticut, or given by any person or persons, to the corporation of the President and Fellows of Yale College in New Haven, and by them invested and held for the use of that institution, shall, with the interest thereof, be and remain exempt from taxation. Provided, however, that the said corporation shall never hold in this State, real estate free from taxation affording an annual income of more than six thousand dollars ; and provided also, that the private property of the officers of the institution, shall not be exempt from taxation ; and that the said corporation shall, on or before the first day of September, A. D. 1834, give its assent to this Act, and transmit the evidence thereof to the Secretary of the State, to be by him recorded." 1 Private Laws, p. 481. The same language in respect to taxation is repeated in § 3822, which was passed in 1882 (Public Acts, Chap. 98) to exclude the charters of the colleges which were claimed to be in the nature of contracts, from the operation of Acts affecting taxation.

Some of the considerations suggested in discussing the clause of § 3820, apply to the construction of this charter. In granting such a charter the State constitutes the corporation its agent, for a purely public purpose, and intrusts it with authority, which can only be derived from the State, to confer degrees in scholarship and learning upon those found worthy. The legislative intent is indicated in the charter of Wesleyan College, which provides that the Act " shall be liberally construed, for every beneficial purpose hereby intended." 1 Private Laws, 472. The State has been very careful to treat its colleges precisely alike in the matter of taxation, and it is hardly possible that one rule of construction was intended for Wesleyan, and another for Yale and Trinity. But it is unnecessary, in treating the question now before us, to invoke any special rule of construction. The charter, in the broadest terms, exempts all the property of the College from taxation. This possibly may cover the buildings occupied as colleges which are non-taxable by virtue of our settled public policy, as declared in § 3820 ; but its main purpose was to exempt all estate and funds invested and held lawfully, *i. e.*, "for the use of the College," including both principal and income,

The only limitation on this absolute exemption is contained in the *proviso:* "Provided, however, that said corporation shall never hold in this State, real estate free from taxation, affording an annual income of more than six thousand dollars." The contention of the defendant is that whenever the income from real estate exceeds the sum of $6,000, not only the real estate producing such excess of income, but also all the unproductive real estate the College may hold, becomes at once liable to taxation. We think this requires us to interpolate into the charter a limitation it does not contain. By the original charter, "all the lands and ratable estate, belonging to the said College, not exceeding the yearly value of five hundred pounds sterling," as well as the estates of the president and professors, were freed from rates, etc. It is not easy to determine the precise meaning of this language, without a detailed examination of the conditions of 1745 in reference to which it was used. This is unnecessary. It is certain that by this provision it was intended to exempt all the property the College was likely to own for an indefinite period, and that the provision served that purpose for nigh a hundred years. The precise restriction the legislature of 1745 had in mind is now immaterial. It was abandoned in 1834; a new provision in respect to taxation, different in form and substance, was then adopted in reference to a new future.

This new provision was intended to be broader than the old, as shown not only by the language used, by the wider field of public usefulness opening to the College, but also by the controlling fact that in view of the full exemption of the College property, *i. e.* the funds devoted to public use, the College surrendered the existing exemption of the private estates of its president and professors. The Act of 1834 plainly exempts all the property of the College from taxation; and the *proviso* qualifies this exemption only for the purpose of imposing a limited restraint on the mode of investment. It is not an absolute limitation to the holding of real estate, but it is a provision which makes it the interest of the College to itself limit its holding. It is not presumed that the College will, to any considerable extent, invest its funds in un-

productive property, so there is no direct limit to its holding of such land; but the College might well be tempted to put all its funds into productive real estate, and the *proviso* directly restrains this tendency by limiting its right to hold real estate producing more than $6,000 a year, unless it pays taxes on the excess. If the College finds in any year that its revenues from land exceed $6,000, it must choose between its unlimited exemption from taxation and its unlimited right to hold real estate; if it chooses the former it must sell so much of its productive land as will reduce its income within the limit, if it chooses the latter, it must pay taxes on the land instead of selling it. In this way the State sought to exempt all the funds of the College from taxation, and through the potent operation of self-interest to keep the investment of those funds in real estate within reasonable bounds.

Counsel for the plaintiff urged with great force, in further support of this view, the fact that here the enacting clause is a total exemption, and a *proviso* can withdraw from the enacting clause nothing that is not fairly within its terms. In speaking of this rule JUSTICE STORY said: "We are led to the general rule of law which has always prevailed, and become consecrated almost as a maxim in the interpretation of statutes, that when the enacting clause is general in its language and objects, and a proviso is afterwards introduced, that proviso is construed strictly, and takes no case out of the enacting clause which does not fall fairly within its terms. In short, a proviso carves special exceptions only out of the enacting clause; and those who set up any such exception, must establish it as being within the words as well as within the reason thereof." *United States* v. *Dickson*, 15 Pet. 141, 165.

For reasons before given, we think that students' fees, whether apportioned to room rent or tuition, cannot be treated as income of real estate, and that land occupied and reasonably necessary for the plant of the College is not productive real estate within the meaning of the *proviso* in the Act of 1834. The vacant lots added by the assessors are exempt from taxation. The dwelling-houses and factories added by

the assessors are also exempt, unless some one or more of these must be added to the list returned by the plaintiff in order to reduce its net income from all its other real estate within its prescribed limit.

Certain questions as to a few items of property were submitted without argument; the nature of these questions is not quite clear. It appears that a lot on Cannon street was sold to one Robert Brown, a professor in the University, by parol, and the money needed to build a dwelling-house advanced to him; that he has built and occupied the house and has repaid a portion of the loan, but has paid nothing on the purchase price. This presents a case of property substantially owned and enjoyed by a private person, while the title remains in the College; the lot and house should be added to the plaintiff's list. Its charter does not exempt from taxation property held for private use. It appears, also, that a number of lots have been leased to private parties on long leases, the tenants agreeing to pay the taxes. So far as the town is concerned, such agreements by the tenants are inoperative. If the revenue from these leases is in excess of the $6,000 derived from the other real estate, the lots should be added to the plaintiff's list. It will be necessary for the Superior Court to proceed to a further hearing for the purpose of ascertaining these facts, unless the parties shall agree.

The record does not show any impropriety on the part of the plaintiff in dealing with its exemption, unless possibly in the case of the Brown house; but in order to exclude any false implication, we deem it proper to add that the charter does not authorize the College to hold any property exempt from taxation for any private use, and does not authorize any commercial dealings with its exemptions, whether by way of mere speculation in vacant land, of selling land on long leases at nominal rents, or otherwise. This statute was intended to serve a great public use in pursuance of a most beneficial public policy, and the construction to be given such a statute requires that the intent shall not be defeated either by clear evasion or undue restriction.

The Superior Court is advised to render judgment ordering

the board of relief to strike from the plaintiff's tax list all the items added by the assessors, except the " Brown house," and except such items, if any, of productive real estate as it may find to be necessary to retain in order to bring the net income from all other real estate within the sum of $6,000 ; and to take further proceedings for the purpose of ascertaining this fact, unless it shall be settled by agreement of the parties.

In this opinion the other judges concurred.