RUSSELL *v.* TRUSTEES OF PURDUE UNIVERSITY.

[No. 25,528. Filed November 1, 1929.]

*Addison K. Sills* and *Fred O. Evans*, for appellant.

*Arthur L. Gilliom*, Attorney-General, *Connor D. Ross*, Assistant Attorney-General, and *Stuart, Simms & Stuart*, for appellee.

WILLOUGHBY, J.—The appellee, "The Trustees of Purdue University," a corporation, as plaintiff, instituted a condemnation proceeding in the Tippecanoe Circuit Court against Phillip A. Russell and Mary J. Russell as defendants. The complaint sought to condemn the fee-simple title of said defendants in the land described in the complaint. The defendants, Phillip A. Russell and Mary J. Russell, each separately filed their written ob-

jections to the proceedings and subsequently filed amended objections. The court overruled certain of said amended objections, which were in the nature of demurrers presenting law questions only, and sustained appellee's demurrer to the remaining amended objections. The cause was tried upon the averments of the complaint.

The complaint, omitting the title, caption and signatures of attorneys, is as follows: Said plaintiff complains of said defendants and for cause of complaint says that said plaintiff is and at the several times hereinafter mentioned has been a corporation duly organized and existing under an act of the General Assembly of the State of Indiana, approved March 6, 1865 (Acts 1865 p. 106), entitled "An Act accepting the provisions of an act of Congress of the United States of America, entitled 'an act donating lands to the several States and Territories which may provide Colleges for the benefit of Agriculture and the Mechanic Arts ; and providing for the receipt, investment and management of said donation," and the various acts amendatory thereof and supplemental thereto enacted by said General Assembly; that, as such corporation said plaintiff is an educational institution of the State of Indiana, which institution is generally known and styled as Purdue University; said plaintiff further avers that its corporate name is "The Trustees of Purdue University"; that, under the laws of the State of Indiana, said plaintiff has and possesses the authority to exercise the power of eminent domain; said plaintiff further says that said defendant, Phillip A. Russell, is the owner in fee simple of the following described real estate in Tippecanoe County, State of Indiana, to wit: Thirty-two and fifty-four one hundredths (32.54) acres off of the east side of the west half of the northwest quarter of section nineteen (19), township twenty-three (23) north, range four (4) west; that said defendant

Mary J. Russell is the wife of her codefendant Phillip A. Russell; that said Phillip A. Russell and Mary J. Russell, defendants herein, are all of the owners, claimants and holders of liens on the property above described known to said plaintiff; that said real estate above described includes the whole of said tract and that said plaintiff desires to acquire the fee-simple title to said real estate above described for the use of said plaintiff to erect thereon and construct, equip, furnish, operate, control and manage dormitories in connection with said Purdue University, for the purpose of said institution and for educational purposes of said plaintiff; that said real estate is located a short distance, approximately 700 feet, west of the main campus or grounds of Purdue University; that the Board of Trustees of said plaintiff has determined and deems it necessary or desirable for the welfare or convenience of said institution to acquire said real estate for the use of said institution as aforesaid and that said Board of Trustees of said plaintiff has further found and determined that a necessity exists to erect, construct, equip, furnish, control and manage dormitories, in connection with said Purdue University for the purposes of said institution; that, before this proceeding was instituted, the written consent of the Governor of the State of Indiana was procured therefor; that said plaintiff intends in good faith to use said real estate for educational purposes of said Purdue University and for the erection thereon of dormitories for the purposes of said institution; said plaintiff further alleges that it has made an effort to purchase said real estate from said defendants but has been unable to agree with said defendants for the purchase of the same; said plaintiff files herewith a plat of said land which said plaintiff hereby seeks to condemn, which said plat is marked "Exhibit A," and the same is made a part hereof.

Wherefore, said plaintiff prays that, upon the filing of

this complaint, notice issue to said defendants as provided by law in such cases, to appear and show cause, if any, why the property described should not be condemned as prayed for herein and that, upon the return of such notice, judgment be entered appropriating said real estate in favor of said plaintiff as hereinabove averred and that three disinterested freeholders of Tippecanoe County, Indiana, be appointed to assess the damages which the owner of said real estate herein sought to be condemned may sustain or be entitled to by reason of such appropriation.

The appellant, Phillip A. Russell, filed written amended objections to the complaint and proceedings therein and, in his amended objections, he says: (1) That said defendant alleges and says that the court has no jurisdiction of the subject-matter and of the petition and parties in this case; (2) that the plaintiff has no right to exercise the right or power of eminent domain for the uses sought, for the reason that there has never been a grant of power of eminent domain to the plaintiff in this case from the sovereignty; (3) that the plaintiff has no right or authority to exercise the right of eminent domain in the manner and form stipulated in said complaint, for the reason that it has never been authorized so to do by the State of Indiana, and for the further reason that it has never had a grant of the power of eminent domain for the uses which it alleges it intends to make of the property sought to be condemned; (4) that the said plaintiff has no right to exercise the power of eminent domain to the extent to which it proposes to appropriate the property of said defendant for the reason that it has never been authorized to condemn or granted the power of eminent domain by the State of Indiana; (5) that the alleged use which the plaintiff intends to make of the property sought to be condemned in this proceeding is not and will not be of public use, and it is not averred that, in the administra-

tion of the use to be made of the property, a public use will be established and administered, nor are facts shown showing that the administration of the alleged use would be a public one; (6) the act of 1911, Acts 1911 p. 468, being §4010 Burns 1926, does not grant to the plaintiff in this case the power or right of eminent domain, for the reason that the plaintiff in this case is not the Board of Trustees of an institution belonging to the State of Indiana; (7) that the act of 1927, Acts 1927 p. 425, under which the plaintiff claims the right to exercise the right of eminent domain as alleged in its complaint, is unconstitutional and void, being in violation of the Fourteenth Amendment of the Constitution of the United States, and also Art. 1, §23 of the Constitution of the State of Indiana, and also Art. 4, §22 of the Constitution of the State of Indiana; (8) that the act of 1927, *supra*, under which plaintiff claims the right to exercise the power of eminent domain, is void for the reason that it attempts to grant to the plaintiff privileges which upon the same terms do not equally belong to all citizens of the State of Indiana; (9) the proceedings and the taking of defendant's lands proposed in plaintiff's complaint constitute a grant to the plaintiff of a privilege denied to this defendant, in violation of Art. 1, §23 of the Constitution of the State of Indiana, and constitutes an abridgement of the privileges and immunities of this defendant and of the equal protection of the laws by the State of Indiana.

Similar objections were filed by the defendant Mary J. Russell. The court overruled each of the separate amended objections numbered 1 to 9 inclusive, of appellant, Phillip A. Russell, and also likewise overruled the separate amended objections, numbered from 1 to 9 inclusive, of the defendant Mary J. Russell. By these rulings all the objections filed were disposed of. The cause was submitted to trial and the court made the

following finding to wit: "That the plaintiff is entitled to condemn in fee simple the lands and interests therein of said defendants, described in said plaintiff's complaint, and each part and parcel thereof as prayed for in said complaint; the court further finds that the specific description of the lands sought to be taken in this proceeding described and set forth include the whole of said parcel or tract of land; and the court, being satisfied of the regularity of the proceedings and the right of said plaintiff to exercise the power of eminent domain for the use sought, does now appoint as appraisers herein, three disinterested freeholders of Tippecanoe County, State of Indiana, to assess the damages that each of said defendants will sustain by reason of such appropriation; and said appraisers are directed to meet on the 29th day of November, 1927, or as soon thereafter as may be, to take the oath required by law and thereafter proceed to determine and report, as by law provided: (1) The value of the property sought to be appropriated and the value of each separate estate or interest therein; (2) the value of all improvements thereon, if any, pertaining to the realty; (3) damages to the residue, if any, of the land of such defendant to be caused by taking out the part sought to be appropriated; (4) such other damages, if any, as will result to any persons or corporations from the construction of the improvements in the manner proposed by said plaintiff. And said appraisers shall, without unreasonable delay, make their report and award in writing to this court and return the same to the clerk thereof." And the defendants and each of them, separately and severally except to the foregoing findings and separately to each of them, and separately and severally except to the appointment of said appraisers herein, and the defendant Phillip A. Russell, now prays an appeal to the Supreme Court of Indiana, which appeal is now granted by the court, with appeal bond in the pen-

alty of $500, naming the surety, and the bond is approved by the court.

It was the contention of the appellant on the trial that the appellee was not endowed with the right or power of eminent domain. That the act of 1927, Acts 1927 p. 425, under which the appellee claimed the right to exercise the right of eminent domain, is unconstitutional and void. That the appellant claims that the alleged and contemplated use of the property sought to be condemned was not a public one.

The appellee claims that a *bona fide* effort to purchase the lands for the use intended, was made before the institution of this proceeding. And that the power of eminent domain and the right to exercise it for the purpose cited in this action is conferred by the act of 1911 and the act of 1927. By the act of 1911, such claim is based on the proposition that Purdue University is an institution belonging to the State of Indiana.

Is Purdue University an institution belonging to the state?

When incorporated universities exist which are founded and supported by the state, they are generally treated by the courts as public rather than private corporations. *State, ex rel.*, v. *Regents of the University* (1895), 55 Kans. 389, 40 Pac. 656, 29 L. R. A. 378, is in accord with other decisions on this point. *Trustees of University* v. *Winston* (1833), 5 Stew. & P. (Ala.) 17; *Lewis* v. *Whittle* (1883), 77 Va. 415.

The University of Michigan is a corporation capable of owning property and is a corporation of public character, having been erected and supported by public funds. The Regents of the University of Michigan, located at Ann Arbor, are successors to the functions and property rights of the University of Michigan located at Detroit. See *Regents of the University* v. *Board of Education* (1856), 4 Mich. 212.

The Florida Agricultural College, having been founded by the state with public money derived in trust from the government of the United States, is a public corporation, and the Legislature has the power to change the trustees thereof. *State, ex rel.,* v. *Knowles* (1878), 16 Fla. 577.

That an incorporated state agricultural society which is one of the agencies of the state and not a corporation for pecuniary profit cannot be held liable for the willful and illegal acts of its agents is the decision in *Hern* v. *Iowa State Agrl. Soc.* (1894), 91 Iowa 97, 58 N. W. 1092, 24 L. R. A. 655. This is decided on the ground that the institution is an agency of the state organized to promote the public good.

The exemption from taxation of the property of the State University of Michigan is sustained in *Auditor General* v. *Regents* (1890), 83 Mich. 467, 47 N. W. 440, 10 L. R. A. 376, on the ground that the institution is a part of the state and that its property is public property and not by virtue of a statutory provision as to the exemption of property of literary and scientific institutions.

It is held in *Trustees, etc.,* v. *Champaign Company* (1875), 76 Ill. 184, that the property of the Illinois Industrial University, which is a body corporate, in reality belongs to the state, although some of it was received by donations from the county and, therefore, such property is exempt from taxation.

Under an act of Congress approved April 14, 1864, (13 Stat. at L. 47), it was provided that: "Any State or territory may accept and shall be entitled to the benefits of the act entitled 'an act donating public lands to the several states and territories which may provide colleges for the benefit of agriculture and the mechanic arts,' . . . by expressing its acceptance thereof as provided in said act within two years from the date of approval of this act, subject, however, to the conditions in said act contained." By an act approved March 6,

1865, the General Assembly of the State of Indiana accepted the provisions of said act of Congress. This act provided that the Governor of this state and four other persons named in the act and their successors were created a corporation under the name of "The Trustees of the Indiana Agricultural College." This act further provides for the duties of said trustees. Acts 1865 p. 106.

In the acts of 1869, Acts 1869 (Spec. Sess.) p. 24, by an act of the Legislature, the donations offered by John Purdue, as set forth and communicated to the General Assembly on the 16th day of April, 1869, and the donation offered by the county of Tippecanoe were accepted by the State of Indiana. Section 2 of the acts of 1869 provides "that the college contemplated and provided for by the act of Congress approved July 2, 1862 (7 USCA §§301-308) is hereby located in Tippecanoe County, at such point as may be determined before the 1st day of January, 1870, and the faith of the state is hereby pledged that the location so made shall be permanent." Section 3 provides that, "in consideration of the donation of John Purdue of money and lands, the said institution shall have the name and style of 'Purdue University,' and the faith of the state was pledged that the said name and style shall be permanent." Section 4, provides that, from and after the date of the location made as aforesaid, the corporate name of the trustees of the Indiana Agricultural College shall be "The Trustees of Purdue University"; and they shall take in charge, have, hold, possess and manage, all and singular, the property and moneys comprehended in said donations, as also the fund derived from the sale of the land scrip donated under said acts of Congress, and the increase thereof and all moneys or other property which may hereafter at any time be donated to and for the use of said institution. They shall also have power to organize said university in conformity with the purposes set

forth in said act of Congress, hold their meetings at such times and places as they may agree upon, do all acts necessary and expedient to put and keep said university in operation; and make all by-laws, rules and regulations required or proper to conduct and manage the same. By an act of the Legislature approved March 9, 1875, Acts 1875 p. 120, it is provided that such "trustees shall, at their first meeting after their appointment, and every two years thereafter, choose a President of said Board, and they shall, at such meeting and every two years thereafter, and whenever a vacancy occurs, elect, by ballot, a Secretary and Treasurer, neither of whom shall be a member of the Board, whose compensation shall be fixed by said Trustees. The said Treasurer shall give bond to the State of Indiana, . . . and he shall receive, take charge of, and, under the direction of said Trustees, manage all the stocks and funds belonging to said University."

By an act of the Legislature approved March 9, 1921, Acts 1921 p. 390, it is provided: "That the board of trustees of Purdue University shall hereafter consist of nine (9) members, to be appointed for such term of service and in such manner as herein provided, and that the members of such board now in office shall continue to serve until the first day of July 1921, at which time, their terms of office shall expire, and the terms of all future trustees shall terminate on the first day of July of the year in which their terms of office expire"; and that "it shall be the duty of the governor of the State of Indiana to appoint nine (9) trustees for Purdue University for the term beginning on the first day of July 1921," and that "three of the trustees so appointed shall be selected by the members of the Purdue Alumni Association, one of whom shall be a graduate of the school of agriculture. . . . Six (6) of the trustees shall be appointed by the governor on or before the first day of

July, 1921, one of whom shall be a woman, as follows: Two of such trustees shall be appointed to serve for a term of one year; two for a term of two years and two for a term of three years; two of the trustees so appointed shall be men of prominence and character in agricultural pursuits; two shall be men chiefly engaged in manufacturing industries; and two shall be citizens of character and distinction."

In 1877, the Legislature provided that the board of commissioners in each county in this state may appoint, in such manner as it may choose, two students or scholars to Purdue University, who shall be entitled to enter, remain and receive instruction in the same, upon the same conditions, qualifications and regulations prescribed for other applicants for admission to said university. And that every student admitted to said university by appointment, by virtue of this act, shall in no wise be chargeable for rooms, light, heat, water, tuition, janitor or matriculation fees. (Acts 1877 [Spec. Sess.] p. 60.)

By an act of the Legislature passed March 10, 1903, Acts 1903 p. 508, it is provided that the trustees and faculty of Purdue University shall encourage and direct farmers' reading courses and publish and distribute circulars and pamphlets of information on the above subjects as may seem profitable in promoting the agricultural interests of the state.

In the acts of 1905, Acts 1905 p. 142, it is provided that a tax of two-fifths of a cent on each $100 taxable property in Indiana be levied, collected and paid into the treasury of the state and the same shall be paid in equal quarterly installments, the first of each quarter, to the treasurer of Purdue University, the same to be expended under the direction of the director of the agricultural experiment station, in providing for the necessary equipment and paying the expenses of conduct-

ing investigations or making experiments, and otherwise acquiring information and disseminating said information, by means of publications, lectures and otherwise, bearing on the production, manufacture, preparation, use, distribution and improvement of agriculture and country life. Section 3 of that act provides that this work shall be carried on by the agricultural experiment station of Purdue University along lines to be agreed upon by the director of the said agricultural experiment station of Purdue University, and an advisory committee of six persons, one person to be appointed by each of the following organizations: The Indiana Federation of Farmers' Association; the State Corn Growers' Association; the State Dairy Association; the State Livestock Breeders' Association; the State Horticultural Society; and the State Poultry Association.

By the acts of 1925, Acts 1925 p. 261, it is provided: "that there is hereby established a department of agricultural statistics in the agricultural experiment station of Purdue University" and "it shall be the duty of the department of agricultural statistics to collect, compile, systematize, tabulate and publish statistical information relating to agriculture, live stock and crop production."

Section 7278 Burns 1926 provides that, when any individual shall give, donate or bequeath a sum of money or other valuable property for the purpose of establishing an institute of technology or other special schools in connection with Purdue University in and on the grounds of said university, the trustees of said university are hereby authorized and empowered to accept such donation on behalf of the State of Indiana.

The acts of 1917 (Acts 1917 p. 679) provide that Purdue University shall, under certain circumstances, furnish free assistance to blind students.

Purdue University has been charged by the Legislature with various other duties pertaining to the state.

The Legislature has provided that it shall perform certain duties respecting the control of hog cholera. See §3727 Burns 1926. It is also assigned duties concerning sales of milk and cream. §3639 Burns 1926. The professor of agricultural chemistry at Purdue University is constituted the state chemist of Indiana and is required to perform certain duties as such. §3599 Burns 1926. Purdue University is also charged with the regulation of sales of commercial fertilizers and required to perform certain duties in relation thereto. §3595-3600 Burns 1926.

As showing the extent to which the State has gone in the support and maintenance of said university, see Acts 1929 p. 390: "For Purdue University at Lafayette: Operating expense and departmental equipment, for the fiscal year beginning October 1, 1929, $1,400,000.00," and also a like amount is appropriated for the fiscal year beginning October 1, 1930.

For street assessments for the fiscal year beginning October 1, 1929, $25,000, and the same amount for the fiscal year beginning October 1, 1930. This appropriation to be in lieu of the tax levy provided for the state educational institutions by Acts 1921, ch. 7, §1. The sum herein appropriated is in addition to all the income of said institution from all permanent funds and endowments and from all land grants, bequests, fees and earnings of said institution from whatever source derived. All receipts from fees and earnings on hand September 30, 1929, and all receipts from fees and earnings accruing thereafter, are hereby appropriated to the board of trustees and may be expended for any necessary expenses of the university.

For the department of agricultural extension, operating expenses, and departmental equipment, for the fiscal year beginning October 1, 1929, $50,000, and a like amount for the fiscal year beginning October 1, 1930.

This appropriation is in lieu of an appropriation provided by Acts 1911, ch. 54, §1. All receipts from miscellaneous sales, interest, fees and other receipts on hand September 30, 1929, and of such receipts accruing to the fund thereafter are hereby appropriated to the board of trustees and may be expended for any necessary expenses of the department of agricultural extension.

For agricultural experiment station and co-operative crop reporting operating expenses and departmental equipment for the fiscal year beginning October 1, 1929, $250,000, and a like amount for the fiscal year beginning October 1, 1930.

For the control and eradication of the corn borer, coddling moth and other injurious pests, for the fiscal year beginning October 1, 1929, $30,000, and a like amount for the fiscal year beginning October 1, 1930.

For soil survey for the fiscal year beginning October 1, 1929, $20,000, and a like amount for the fiscal year beginning October 1, 1930. This appropriation to be in lieu of the tax levy provided by Acts 1921, ch. 17, §1, and in lieu of the swine-disease fund appropriation provided by Acts 1913, ch. 135, §10, and in lieu of the creamery-license fund appropriation provided by Acts 1913, ch. 340, §11. All receipts from farm and miscellaneous sales, interest, fees and other receipts on hand September 30, 1929, and all such receipts accruing to the agricultural experiment station thereafter are hereby appropriated to the board of trustees, and may be expended for the necessary expenses of the agricultural experiment station.

It will be observed that the legislative act of appropriation asserts title to all receipts from farm and miscellaneous sales, interest, fees and other receipts, by appropriating the same to the university, and, by the acceptance of the appropriations named in said act, the university accedes to such claim.

Purdue University constitutes no part of our system of common schools and has no direct connection with that system; but it is an institution of learning ■ primarily endowed by Congress, and continued in existence very largely by appropriations made by the General Assembly of this state. It is, therefore, an educational institution sustaining relations to the people at large analogous to those occupied by other public schools and colleges of the state, maintained at public expense, and one in which all the inhabitants of the state have a common interest. The general principles underlying the educational system of the state are, consequently, applicable to the government and control of Purdue University, and, in the absence of express legislative provisions, must be invoked in determining the powers which that institution may exercise. *State, ex rel.*, v. *White* (1882), 82 Ind. 278.

In *Bullock* v. *Billheimer* (1911), 175 Ind. 428, 94 N. E. 763, the court, in discussing the control of Purdue University, says: "By Art. 8, §1, of the Constitution it is made the duty of the General Assembly to 'encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement,' and it has been held that it is the province of the legislature to determine how, and by what instrumentalities the common-school system shall be administered. . . . Upon the same analogy, the legislature may determine how, and by what instrumentalities, 'scientific and agricultural improvement may be made.' It is even less hampered in this respect than it is with respect to the [public] school system, which is required to be 'general and uniform,' and the provision of these advisory bodies does not in any respect curtail the general and controlling administration, or limit, specialize or restrict the uniformity of operation or the benefit to the people at large. The act of 1909, *supra* [Acts 1909 p. 89], is not ineffective or un-

constitutional by reason of the provision for an advisory committee to act with the director of the experiment station. If said committee performs its duty, it is a public one, in which the public is interested. . . . The act does not violate Art. 1, §23, *supra*, forbidding the granting of special privileges by authorizing these associations to appoint an advisory committee. The right to appoint is a duty, not a privilege, and is exercised, not for the benefit of the association, or the individual members composing it, but for the public. It is general in its objects and purposes. These associations are educational and *quasi*-public corporations, organized for the public benefit. (See *Downing* v. *Ind. State Board, etc.* [1891], 129 Ind. 443.) It is also urged that the appropriations to the various associations under the act of 1909, *supra*, are invalid, as providing aid to private corporations. Bearing in mind that none of these associations is organized for pecuniary profit, but for public purposes, and looking to their character and purposes, it is manifest that the uses are public, and the test is not the means employed, but the use, the object sought; and with this in view, unless some provision of the Constitution may be pointed to prohibiting the agencies employed, we must assume that, even if they could be regarded as private corporations, the legislature is the judge of the agencies it will employ for public ends and purposes."

It is contended by the appellant that the erection and maintenance of dormitories would not be of public use, and that the condemnation of public property is not for the purpose of erecting the dormitories for a public purpose, but that the use of the dormitories in connection with the college is for a private purpose. This contention cannot be sustained. "Dormitory" is defined in Webster's dictionary as a sleeping room or a building containing a series of sleeping rooms. A sleeping apart-

ment capable of containing many beds, especially one connected with a college, boarding school, monastery, etc. In *Yale University* v. *New Haven* (1899), 71 Conn. 316, 42 Atl. 87, 43 L. R. A. 490, it is held that buildings used by a college exclusively as dormitories and dining halls for its students are exclusively occupied as a college within the meaning of General Statutes §3820, providing for the exemption of such buildings from taxation. In discussing said section, the court said, "Section 3820 of the General Statutes provides that 'buildings or portions of buildings exclusively occupied as colleges, academies, churches or public school-houses or infirmaries,' shall be exempt from taxation. If buildings used by the College exclusively as dormitories and dining halls for its students, are buildings exclusively occupied as a college, then the action complained of in adding to the list dormitories and dining hall, was illegal; if such use is not a college occupation, then said action was legal. The word 'college,' used to denote a constituent of or equivalent of 'university,' has acquired a definite meaning. As first used 'college' indicated a place of residence for students." Again, in the same case, the court says, "The settled meaning of 'college' as a building or group of buildings in which scholars are housed, fed, instructed and governed under college discipline, while qualifying for their university degree, whether the university includes a number of colleges or a single college, is now attacked. We have deemed it proper to trace this meaning with sufficient detail to demonstrate the utter unreason of this attack. This peculiar function of a college is inherent in the best conception of the university. This meaning has been attached to the English word for 800 years; it was the only meaning known at the time our first American colleges were founded, it was recognized and distinctly affirmed in the charter of Yale College, it has since been affirmed by repeated acts of legislation, and has received

the sanction of constitutional confirmation. It was impossible for the legislature to express its meaning more clearly than in the language of §3820: 'Buildings occupied as colleges.' If it had said: 'Dormitories, dining-halls and other buildings occupied as colleges,' the meaning would have been the same, and the amplification would have added nothing to the precise certainty of the language used. *State* v. *Ross*, 24 N. J. Law 497; *Northampton Co.* v. *Lafayette College*, 128 Pa. 132, 18 Atl. 516."

In *Tucker* v. *Pollock* (1899), 21 R. I. 317, 43 Atl. 369, it is held that the Rhode Island College of Agriculture and Mechanic Arts is a state institution; the title to the land, buildings and other property is in the state, and the Board of Managers, although made a corporation by virtue of public laws, is but the agent of the state to carry out the purposes of the General Assembly in connection with the establishment and maintenance of the college.

We conclude that Purdue University is an educational institution belonging to the State of Indiana, within the meaning of Acts 1911, ch. 189, being an act authorizing institutions belonging to the State of Indiana to exercise the right of eminent domain. That such act granted the right of eminent domain to the trustees of Purdue University. And further that the alleged use of the property sought to be condemned was a public one.

The appellant insists that the act of 1927 violates Art. 1, §23 of the Constitution of the State of Indiana, in that it grants to Purdue University privileges or immunities which, upon the same terms, do not equally belong to all citizens. This position is not tenable because Purdue University is in a class by itself and the Legislature may legislate directly concern-

ing the same. See *Bullock* v. *Billheimer, supra; State, ex rel.,* v. *Knapp* (1914), 125 Minn. 194, 145 N. W. 967; *Budd* v. *Hancock, Comptroller* (1901), 66 N. J. Law 133, 48 Atl. 1023. However, this is not important, because, as we have said, Purdue University was granted the right of eminent domain by the act of 1911.

It appears that every material fact alleged in the plaintiff's complaint is sustained by some evidence. We find no error in the record.

Judgment affirmed.