# In the
# United States Court of Appeals
## For the Seventh Circuit
―――――――

No. 06-1538

DEBBIE A. PEIRICK,

*Plaintiff-Appellant,*

*v.*

INDIANA UNIVERSITY-PURDUE UNIVERSITY INDIANAPOLIS
ATHLETICS DEPARTMENT; INDIANA UNIVERSITY-PURDUE
UNIVERSITY INDIANAPOLIS; and THE BOARD OF TRUSTEES
OF INDIANA UNIVERSITY,

*Defendants-Appellees.*

―――――――

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 03 C 1965—**Larry J. McKinney**, *Chief Judge.*

―――――――

ARGUED NOVEMBER 28, 2006—DECIDED DECEMBER 14, 2007

―――――――

Before FLAUM, MANION, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* During Debbie Peirick's thirteenth and final year as head coach of the women's tennis team at Indiana University-Purdue University Indianapolis (IUPUI), her team maintained the highest grade point average of all athletic teams, achieved its best season in history, and, for the first time, qualified for the NCAA tournament. Despite this record, Peirick, then age fifty-three, was fired when the season ended. Within a month of her termination, IUPUI hired the twenty-three

year old sister of the men's tennis coach to coach the women's tennis team.

Peirick sued IUPUI, the IUPUI Athletics Department, and the Board of Trustees of Indiana University, claiming that her termination was motivated by gender and age. The district court granted summary judgment for the defendants on both claims. Material questions of fact exist as to whether Peirick was treated less favorably than her similarly situated male counterparts, so we vacate the grant of summary judgment on her gender discrimination claim. However, because IUPUI and the Board of Trustees of Indiana University are immune from suit under the Age Discrimination in Employment Act (and the athletic department is not a suable entity separate from the university), we affirm the grant of summary judgment on Peirick's age discrimination claim.

## I. BACKGROUND

The following facts are recited in the light most favorable to Peirick, the nonmovant for summary judgment. Peirick became the head women's tennis coach at IUPUI in 1990. Six years later, Michael Moore accepted the position of Athletic Director, with authority to hire and fire IUPUI's coaches. Denise O'Grady joined IUPUI as Assistant Athletic Director and Senior Women's Administrator in October 2002, eight months before Peirick's termination.

The Department evaluated all coaches at IUPUI based on performance expectations for academics, community service, compliance, budget management, fundraising, professional conduct and development, and athletic competition. The parties do not dispute that Peirick excelled in most areas. Her players performed well academically, far exceeding the 2.6 grade point average (GPA) requirement, and they often had the highest or second

highest GPA for all of IUPUI's athletic teams. Peirick was routinely acknowledged by the Athletics Department for encouraging her team's academic performance. She received community service awards, including the 1998 U.S. Tennis Association's Collegiate Community Service Award, a distinction extended to only ten coaches across the country. She never received an NCAA rule violation of any sort during her thirteen-year tenure. No one complained about her budgeting or fundraising abilities. During 2002-2003, Peirick's final year as coach, the women's tennis team had its best season in school history. It went undefeated during regular season play, won its first Mid-Continent Conference championship, and became the first women's team at IUPUI to advance to the NCAA post-season tournament. For her achievements, Peirick was named the 2004 College Coach of the Year by the Midwest Division of the U.S. Professional Tennis Association.

But IUPUI maintains that deficiencies in Peirick's professional conduct overshadowed all of these virtues. According to Moore, events occurring during the two-month window between April and June 2003 led to Peirick's termination. On April 6, 2003, the parents of Emily Dukeman, a team member, sent Moore an email message complaining that Peirick used "negative, foul language," "lacked professional qualities," and made being on the team a "very unpleasant and degrading experience." The message also claimed that "several players may not return next year."

Next, IUPUI says that five of the eight members of the team met with O'Grady on April 10, 2003, to complain about Peirick. During that meeting, which the students requested, they said that Peirick used abusive language, "would yell at them and scream at them, and tell them to shut up," and directed profanity towards the students and coaches of other teams. Further, O'Grady says that the

students complained that when they were returning from a road trip to Tennessee, Peirick drove a van of students out of a restaurant parking lot without waiting for the other van of students or making sure they had directions. The students also said that Peirick was an unsafe driver, who drove too fast for the road conditions. (O'Grady says she also felt uncomfortable when riding with Peirick during the trip to the NCAA tournament.) O'Grady claims she took the complaints seriously because it was uncommon for a group of students to come forward with complaints, and because athletes were often reluctant to complain at mid-season when their playing time could be adversely affected.

IUPUI claims that Peirick's handling of a scheduling conflict involving the Indianapolis Tennis Center was the key factor in her termination. In early April 2003, the women's tennis team was on target to win the Mid-Continent regular-season crown, an achievement that would entitle them to host the Mid-Continent Conference Tournament. The team practiced and played at the Tennis Center, an exceptional facility, and it expected to host the Tournament there. When Peirick sought to reserve the Tennis Center, she learned that it was already booked and conveyed this fact to Moore and O'Grady. After trying to resolve the scheduling conflict, Moore and O'Grady decided that they would have to secure an alternate, off-campus location for the Mid-Conference Tournament. Peirick asked Moore and O'Grady not to share this information with the team for fear that the disappointment might affect their play in remaining games.

On April 15, 2003, after the regular season ended, Peirick informed her players that they would not be able to host the Mid-Continent Tournament at the Tennis Center. Later that day when two team members confronted O'Grady about the situation, O'Grady was surprised by the extent of their anger and asked them to

explain their feelings. According to O'Grady, the team members stated that "Coach Peirick had informed them that the tennis center was not going to be available for the conference tournament, and indicated to them that it could have—it could be available, but that the athletic administration would not pick up the phone and make the call to reserve the center . . . ." Moore and O'Grady thought Peirick had lied, and Moore claims this was the final straw requiring her termination.[1] Neither Moore nor O'Grady ever informed Peirick of the concerns that emerged during the months preceding her termination, and she was given no opportunity to respond or improve either before or at the time of her termination.

It is not clear whether Peirick was entitled to a warning. The answer to that question, IUPUI suggests, depends only on whether Peirick was an hourly or appointed employee. IUPUI classifies employees into a dizzying array of categories: part-time, full-time, hourly, appointed, monthly appointed (appointed and paid on a monthly basis), biweekly appointed (appointed and paid on a biweekly basis), to name a few. Only the hourly versus appointed distinction is relevant to our review.

IUPUI's Hourly Staff Handbook provides that an hourly employee "may work irregular, intermittent, or on-call hours," and that hourly positions are intended to be "less than full time, and [to] supplement[] full and part-time appointed positions in the department." Further, "[s]ince hourly employees fill in for temporary needs of

---

[1] IUPUI cites Peirick's conduct during the team's trip to Los Angeles for the NCAA Regional Tournament from May 8-11, as an additional basis for their failure to reinstate her. However, Moore testified that he made the decision to terminate Peirick before the NCAA tournament, so we do not consider those additional justifications.

the department, some of the policies and benefits that apply to appointed staff such as probationary periods, seniority, paid time off and *progressive discipline*, do not apply to hourly staff." By contrast, "[a]n appointed position is one that is needed for at least nine months in a 12-month period and is needed for at least 20 hours a week . . . ." Appointed employees "may be eligible for benefits such as paid time off, health and life insurance, retirement, fee courtesy, etc." So, by IUPUI policy, appointed, but not hourly employees, were guaranteed progressive discipline.

This is not to say that the difference between hourly and appointed employees had any practical significance. Hourly and appointed staff were held to the same performance standards. Employees were not made aware of the two designations, and Moore provided progressive discipline to hourly employees—persons that he considered "valuable." Before terminating Peirick, Moore asked O'Grady to speak with IUPUI's Human Resources Department about IUPUI's disciplinary process. At her deposition, LaVonne Jones, an Employment Consultant within the Human Resources Administration, testified that O'Grady had said that Peirick was an hourly employee. Based on that representation, Jones told O'Grady what options the Athletics Department had. It could consider demoting Peirick, talking to her, calling a meeting, or terminating her. O'Grady shared these possibilities with Moore, and he made the decision to terminate.

On June 10, 2003, Moore informed Peirick, who was 53 years old, that she would not be invited back to coach the women's tennis team during the following year. In explaining his decision, Moore simply stated that he wanted to take the women's tennis program in a "new, different direction." At that time, he gave Peirick the option of retiring, to avoid the embarrassment associated with nonrenewal. After Peirick's termination IUPUI

detailed its alleged bases for terminating her. Peirick was replaced by Andrea Lord, the twenty-three-year-old sister of the men's tennis coach. Although she had never coached a team and finished college only a year before accepting the position, Lord was paid $14,000 annually, nearly $3,000 more than Peirick had been paid during the preceding year.

Peirick filed suit against IUPUI, the IUPUI Athletics Department, and the Board of Trustees of Indiana University, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 to 634. The defendants filed a motion for summary judgment, and the district court granted that motion as to Peirick's ADEA claim but denied the motion with respect to Peirick's Title VII claim. Just before trial, the defendants filed a motion for reconsideration of the ruling on summary judgment and the district court granted summary judgment in the defendants' favor on Peirick's Title VII claim. Peirick now appeals.

## II.  ANALYSIS

### A.  The Summary Judgment Standard of Review

We review the district court's grant of summary judgment de novo, affirming only if, after construing all facts in the light most favorable to the nonmoving party, we find no genuine issue of material fact and that the defendants are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Vinning-El v. Long*, 482 F.3d 923, 924 (7th Cir. 2007). With this standard in mind, we turn first to Peirick's claim of gender discrimination.

**B. Summary Judgment Should Not Have Been Granted on Peirick's Gender Discrimination Claim**

Title VII makes it an unlawful employment practice for an employer "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). As Peirick seeks to prove her case by the indirect method of proof, we analyze her claim under the burden-shifting approach announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Under *McDonnell Douglas*, a plaintiff must first make out a prima facie case of gender discrimination. Peirick may do so by showing: (1) she is a member of the protected class, (2) she met her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) her employer treated similarly situated male employees more favorably. *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 559 (7th Cir. 2007) (citing *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006).[2] At that point, the employer must offer a legitimate nondiscriminatory reason for the adverse employment action, which the employee may rebut by showing that the reason is a mere pretext for discrimination. *Id.* The only issues on appeal are whether Peirick

---

[2] Recently, we explained that, under certain circumstances, a plaintiff may also satisfy the fourth prong of the *McDonnell Douglas* framework by showing that "the employer needs to find another person to perform that job after the employee is gone . . . ." *Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 846 (7th Cir. 2007). Because, as discussed below, Peirick satisfies the traditional formulation of *McDonnell Douglas*, we need not consider whether she could also meet the standard articulated in *Pantoja*.

satisfied the second and fourth elements of the prima facie case, and whether she rebutted the defendants' proffered nondiscriminatory reason for the adverse employment action.

Where, as here, an employee claims that she "performed satisfactorily and the employer is lying about the business expectations required for the position, the second prong and the pretext question seemingly merge because the issue is the same—whether the employer is lying." *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 823 (7th Cir. 2006); *see Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997) ("The defendant's expectations are not legitimate if they are phony; so if they are argued to be phony, the issue of legitimate expectations and the issue of pretext seem to merge."). Therefore, we begin with the fourth prong of the prima facie case.

### 1. Similarly Situated Individuals Were Treated More Favorably Than Peirick

Peirick offers three individuals as similarly situated employees: men's soccer coach Steve Franklin; men's tennis coach Richard Lord; and men's and women's golf coach John Andrews. IUPUI contends they are not valid comparators because they had different classifications or engaged in misconduct different in degree or kind than Peirick.

To assess whether two employees are similarly situated, "a court must look at all relevant factors, the number of which depends on the context of the case." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). "[I]n disciplinary cases—in which a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason—a plaintiff must show that he is similarly situated

with respect to performance, qualifications, and conduct." *Id.* (internal citations omitted). Typically this involves showing that the employees shared the same supervisor, performance standards, and "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 617-18. That said, "[o]ur similarly situated requirement 'should not be applied mechanically or inflexibly.'" *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 791 (7th Cir. 2007) (quoting *Hull v. Stoughton Trailers, LLC*, 445 F.3d 949, 952 (7th Cir. 2006)).

IUPUI first contends that Peirick was an hourly employee and that as such, she may only be compared with other hourly employees. Since Richard Lord and Steve Franklin were appointed employees during most or all of their employment, IUPUI insists that Peirick may only compare herself to golf coach John Andrews. Andrews, IUPUI continues, was not similarly situated because he did not engage in any termination-worthy conduct—his only infractions being a few insubstantial NCAA rule violations. But IUPUI is only partly right.

We agree with IUPUI that Peirick was an hourly employee. Although Peirick received annual letters of appointment, retirement benefits, never punched a time clock or received overtime pay, under IUPUI policy, these facts are not inconsistent with being an hourly employee. And Human Resources paperwork demonstrates quite clearly that throughout her tenure Peirick was designated an hourly employee. But we are not convinced that the hourly and appointed designations (which are only noted in HR files) influenced the Department's treatment of its coaches or should bear upon our similarly situated analysis.

In fact, Moore routinely disregarded the hourly and appointed designations. At his deposition, Moore testified

that he gave progressive discipline to employees he considered "valuable," without regard to their employment classification. Underscoring this point is the fact that the hourly versus appointed distinction was not understood by members of the Athletics Department. At the time of his deposition, Moore was fairly cloudy as to when employees are entitled to progressive discipline. When asked if he knew whether the Athletics Department had a policy of progressive discipline, he said, "I believe there is one in place for certain classes of employees through the university." At other points in his deposition, Moore explained that in determining an employee's entitlement to progressive discipline, the relevant distinction is the part-time versus full-time classification. For example, Moore testified that he gave coach Franklin, who was accused of verbally abusing members of the men's soccer team, the benefit of progressive discipline because he felt that was how he was supposed to treat a "full-time professional employee."

Likewise, at her deposition, O'Grady recalled speaking with LaVonne Jones of Human Resources about the significance of part-time versus full-time employment. According to O'Grady, Jones said that "the progressive discipline policy and procedure did not apply to a part-time employee; that we were not required to go through the progressive discipline process with a part-time position." But O'Grady did not know what document would inform a coach that part-time and full-time employees are treated differently when it comes to progressive discipline. In fact, no such document exists, because the relevant distinction is between hourly and appointed, not part-time and full-time, employees. Given the considerable misunderstanding regarding the employee classifications, and Moore's practice of providing progressive discipline to "valuable" employees, we doubt that the Athletics Department took heed of employee

classifications when doling out sanctions. We will not give the hourly versus appointed distinction more importance than IUPUI did.

So, in the context of this case, we consider whether Peirick and the three male coaches were similarly situated—though only Andrews was an hourly employee during his entire tenure. All three coaches were judged according to the same performance standards, were supervised by Moore, and had spotty performance histories. Yet only Peirick was terminated without the benefit of progressive discipline. The central question for our review, then, is whether Peirick and her colleagues engaged in similar misconduct, but received dissimilar treatment. Of course, employees may be similarly situated to the plaintiff even if they have not engaged in conduct identical to that of the plaintiff. "[T]he law is not this narrow; the other employees must have engaged in similar—not identical—conduct to qualify as similarly situated." *Ezell v. Potter*, 400 F.3d 1041, 1050 (7th Cir. 2005).

In *Ezell*, we concluded that the plaintiff, a mail carrier accused of taking an unauthorized extended lunch, and his colleague, a mail carrier who had lost a piece of certified mail, were similarly situated. *Id.* Taking a common sense view, we reasoned that in the postal service, whose sole function is to ensure to delivery of mail, "[m]isplacing certified mail, that is, mail that has been designated as especially important by its sender, would seem to be a serious matter." *Id.* Further, given that another carrier had been fired for delaying mail delivery, we inferred that "losing mail would also be a serious offense, at least as serious as taking a long lunch." *Id.* As reflected in *Ezell*, in deciding whether two employees have engaged in similar misconduct, the critical question is whether they have engaged in conduct of comparable seriousness. *See Little v. Ill. Dep't of Revenue*, 369 F.3d

1007, 1016 (7th Cir. 2004); *see also Davis v. Wis. Dep't of Corr.*, 445 F.3d 971, 978-79 (7th Cir. 2006); *Spath v. Hayes Wheels Int'l-Ind.*, Inc., 211 F.3d 392, 397 (7th Cir. 2000). Comparable seriousness may be shown by pointing to a violation of the same company rule, *Davis*, 445 F.3d at 978-79, or to conduct of similar nature, *Hiatt v. Rockwell Int'l Corp.*, 26 F.3d 761, 770 (7th Cir. 1994).

Mindful of these principles, we turn to Peirick's proffered comparators. First, we agree with IUPUI that John Andrews, the head golf coach, is not an adequate comparator. Peirick cites Andrews's reprimand for two NCAA rule violations and comments in his 2002 evaluation stating that he needed to improve his documentation and paperwork. These two performance concerns are minor when compared to Peirick's alleged misconduct. The women's basketball coach acknowledged that NCAA rule violations are not uncommon, and Moore stated that, by definition, NCAA secondary rule violations are not serious. Nor has Peirick provided us with any basis for believing that the Department considered administrative responsibilities as important as the obligation to treat players with civility. For these reasons, we conclude that Andrews and Peirick are not similarly situated.

However, we think that Franklin and Lord are valid comparators. They both engaged in serious violations of Indiana University's Statement of Principles on the Conduct of Participants in Student Athletic Programs and were consistently provided progressive discipline.

Steve Franklin received repeated complaints of verbal abuse in 2002 and 2003, about the time of Peirick's termination. In January 2003, two players who left the soccer team indicated in their exit interviews that they were leaving, in part, because of issues with the coaching staff or style. They both recommended that a new head coach be hired and stated that Franklin was "often"

verbally abusive. One student said that he thought other coaches had left the team because of Franklin, Franklin did not inspire the team, and yelling was the way Franklin communicated with and motivated his players. The other stated that Franklin engaged in "mind games, demeaning [sic] & insulting players." A parent echoed these sentiments in a letter to Moore in October 2003, stating that during the course of four years, he had witnessed Franklin's "pervasive pattern of verbal and emotional abuse." Another letter sent by a parent to IUPUI's chancellor indicated that one student "ha[d] been verbally and emotionally abused while on the soccer team at IUPUI." Further, the parent speculated that "[a]s evidenced by the number of players who have left this team over the recent years, in my opinion, he was probably not alone[.]" Franklin acknowledged in his deposition that on at least two occasions, a parent had called Moore to complain about Franklin's conduct and that a parent called Moore at halftime during one soccer game to say that Franklin should be fired.

Each of these complaints was met with progressive discipline. Moore allowed Franklin to respond to the criticisms of the parent who requested Franklin's termination during halftime. In October 2003, Moore wrote a letter to Franklin stating that Franklin's use of sarcasm, bullying, and mental games with the players had contributed to a "perceived culture of lack of respect for student-athlete dignity and emotional well being within the men's soccer program." Moore and O'Grady met with Franklin on multiple occasions to discuss the letter of reprimand and Franklin's plan for improvement. Franklin explained that Moore and O'Grady counseled him to take "a kinder and gentler demeanor and approach," and informed him that they would be watching his behavior and would meet with him at the end of the season to determine whether he would be retained. At the end of the

year, Moore and O'Grady were happy with Franklin's progress and he was invited back to coach for the 2004 year.

Richard Lord, the men's tennis coach, is also a valid comparator. In his deposition, Lord acknowledged that as the men's tennis coach his duties were akin to Peirick's and he could think of no distinctions in their responsibilities. Throughout his tenure at IUPUI, Lord engaged in serious misconduct for which he could have been terminated. He received extremely low marks on his 1999 evaluation in the following areas: being organized in practice and game preparations, developing the potential of student-athletes, providing strong leadership and discipline, establishing clear team and individual goals, and displaying exemplary conduct at all times when with the team. The evaluation concluded by saying that Lord's "future IUPUI employment as men's tennis coach depend[ed] on improvement in the areas discussed in this document." In February 2000, he was issued a written reprimand for "public behavior unbecoming of a head coach" based on his admission that his students had consumed alcohol during a road trip. Lord acknowledged that in approximately 2002, Moore counseled him not to use profanity with players in response to a complaint of verbal abuse. Lord also had numerous NCAA violations, one of which resulted in a week-long suspension from coaching. Despite his clear performance problems—losing records in most, if not all, of his years as head men's tennis coach, NCAA rule violations, problems fulfilling administrative requirements, complaints regarding use of profanity and permitting students to drink alcohol—he was never terminated, but voluntarily resigned his position sometime after Peirick's dismissal.

Peirick was accused of using abusive language, unsafe driving, leaving students behind during a road trip, and

pitting the students against the administration during the Tennis Center scheduling conflict. According to IUPUI's position statement in response to Peirick's EEOC Charge of Discrimination, these acts amounted to violations of Indiana University's Statement of Principles on the Conduct of Participants in Student Athletic Programs. In particular, Peirick was accused of violating Section 3.1.4, which states that "The obligation of coaches to treat others with dignity and respect is not limited to their interaction with student athletes, but shall apply to their treatment of all other participants . . . ." The University further alleged that Peirick had violated Section 2.4, which states that "The conduct of all participants shall reflect the fact that by virtue of their participation in the student athletic programs sponsored by Indiana University, they are representing the University. As a result, participants are expected to exhibit a higher standard of behavior than might be expected of other students, staff, and faculty, and to avoid conduct that is likely to appear improper." Although Franklin and Lord did not engage in the exact same misconduct as alleged of Peirick, they violated the very same rules as Peirick. *See Davis*, 445 F.3d at 978 (that employees engaged in "identical rule violations" provided some indication that the offenses were of "comparable seriousness").

Franklin repeatedly contravened Section 3.1.4, which directed coaches to treat students with dignity and respect. Indeed, in his written reprimand, Moore told Franklin that his conduct had created a "culture of lack of respect for student-athlete dignity and emotional well being within the men's soccer program." Likewise, Lord was accused of being verbally abusive. Lord also violated Section 2.4's directive to avoid the appearance of impropriety when he engaged in "public behavior unbecoming of a head coach" by allowing students to drink alcohol while on a road trip. Moreover, we can be sure that

the University considered Lord and Franklin to have engaged in serious misconduct, as both were warned to improve or face termination. We find both to be similarly situated employees, who were treated more favorably than Peirick.

## 2. IUPUI's Bases for Terminating Peirick Are Suspect

IUPUI argues that Peirick's performance fell below its legitimate expectations, and that for this reason, she can neither satisfy the second prong of the prima facie case nor show that the proffered basis for her termination—her failure to meet IUPUI's standards—is a pretext for discrimination. Specifically, IUPUI claims that it decided not to reinstate Peirick because she used abusive language when talking with students, left a van of students behind in Tennessee, was an unsafe driver, and told students that the administration was to blame for the unavailability of the Tennis Center during the conference tournament. Our task is to determine whether these were IUPUI's true reasons for discharging Peirick, not whether they were wise bases for doing so. *See Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000).

As a result, our analysis begins with IUPUI's performance expectations for coaches. IUPUI's published performance expectations include standards for academics, community service, compliance, budget management, fundraising, athletic competition, and professional conduct and development. IUPUI does not dispute that Peirick outshined her colleagues with respect to the majority of these documented expectations. She was praised for encouraging academic excellence amongst her players, who consistently earned the highest or second highest GPA of all of IUPUI's athletic teams. Peirick was nationally recognized for her community service. Over the course of

thirteen years at IUPUI, she never received an NCAA rule violation of any sort. The record provides no basis for believing there to have been deficiencies in her budgeting or fundraising. Also, under her leadership, the women's tennis team earned its best record in school history and became the first women's team at IUPUI to advance to the NCAA post-season tournament. Her success was recognized in 2004, when the Midwest Division of the U.S. Professional Tennis Association awarded her Coach of the Year. None of this matters, says IUPUI, because Peirick fell terribly short on a single measure—professional conduct—and that merited termination. But, on this record, a jury could disbelieve IUPUI.

To begin, IUPUI never warned Peirick that her foul language, poor driving, inattentiveness to trailing vehicles, and expression of frustration during a scheduling conflict could lead to dismissal. Even at the time of her termination, Moore simply told her that he was looking to take the Department in a "new, different direction." Moore says he "chose not to discuss the performance issues with Peirick because [he] did not believe that Peirick would change her behavior." But this does not explain why he failed to share his reasons with Byron Clark, Peirick's direct supervisor, or O'Grady. Moore's explanations were not forthcoming until Peirick filed a complaint with the Equal Employment Opportunity Commission.

Further, IUPUI's delay in addressing its alleged concerns undermines its claim that Peirick's behavior was unsafe or severe. Although the parents of Emily Dukeman complained about Peirick on April 6, 2003, Moore did not ask O'Grady to follow-up on that complaint until a month later. Also in early April, O'Grady says students complained that Peirick was an unsafe driver, who once abandoned them on a road trip. O'Grady did not broach these issues with Peirick. Instead, in May, when she

accompanied the team to the NCAA tournament, O'Grady sat quietly as Peirick drove the team about L.A.[3] The act meriting termination, IUPUI says, occurred on April 15th. That day, Peirick told her team that the Tennis Center would be unavailable, voiced her frustrations, and directed the students to seek out the administration for answers. The fallout of Peirick's impetuousness—the gripes of a disappointed few—came to an end by the close of day. Although IUPUI claims it thought Peirick had lied and been disloyal, it handled this episode as it had every other alleged performance concern, by failing to utter a word to Peirick. The administration would not act for two months—not even in the face of purported safety concerns. This pattern of delay leads us to question whether IUPUI was truly concerned about Peirick's language, driving, or handling of a scheduling conflict.

We also think a jury could find that IUPUI overstated matters to justify its actions. Compare *Plotke v. White*, 405 F.3d 1092, 1106 (10th Cir. 2005) ("On this record, a jury could reasonably infer the Army discriminated against Dr. Plotke by suddenly reassigning her from the Haiti Project to CAC-WIN and then contriving and grossly exaggerating the TDY incident as a means of exercising gender animus towards her."). IUPUI suggests that all the students that attended the April 10th meeting were displeased with Peirick. But the affidavits and depositions of tennis team members tell a different story. Although five students, Michelle Cunningham, Hillary Byard, Mallory Stemle, Emily Dukeman, and Natalie Bednar,

---

[3] Further, IUPUI did not even ask Peirick's replacement, Andrea Lord, about her driving history, despite its stated concern. If IUPUI had investigated Lord's driving history, it would have discovered that a few years before she was hired, Lord fell asleep at the wheel, resulting in a crash that caused her car to flip.

attended the April 10th meeting, three of those stu-
dents—the only students to have submitted affidavits or
offer testimony in this case—have come to Peirick's
defense. In her affidavit, Hillary Byard stated that the
team met with O'Grady because some of the students,
especially Emily Dukeman and Mallory Stemle, had
personality conflicts with Peirick. The other three atten-
dees, however, thought Peirick was a good coach. Some
said they did not find her verbally abusive or an unsafe
driver; they thought she truly cared about the students
both on and off the court; they would call on her to dis-
cuss any problem; and they considered her a friend.
When they heard about Peirick's termination, Michelle
Cunningham, Natalie Bednar, and Hillary Byard were
all "shocked" and "surprised."

Peirick's colleagues were similarly perplexed. Byron
Clark, Peirick's direct supervisor, and Kristin Emer-
son-Simpson, the women's head basketball coach, were
surprised by the termination. Men's soccer coach Steve
Franklin was "stunned." As he put it: "Debbie was coming
off an undefeated season. She was named Coach of the
Year, I believe. I think she had the Player of the Year
and the Newcomer of the Year, and I think it was the
first time a tennis [team]—in the mid-continent had gone
undefeated. . . . [T]o me, that seemed like a successful
season." Even Lord, whose sister filled Peirick's position,
was "surprised" that Peirick had been terminated. Al-
though the opinions of nondecisionmakers as to Peirick's
performance cannot carry the day, *see Johnson v. City of
Ft. Wayne*, 91 F.3d 922, 936 (7th Cir. 1996), their re-
sponses to the termination decision provide some indica-
tion of the type of conduct historically considered termina-
tion worthy. And we find it striking that these coaches
were so baffled by the administration's decision. The
termination of a coach with Peirick's qualities appears to
have been an unprecedented event in IUPUI's history. *See*

*Gordon v. United Airlines, Inc.*, 246 F.3d 878, 890 (7th Cir. 2001) (taking unprecedented disciplinary action may be evidence of pretext).

In sum, we find IUPUI's post hoc explanations, delay, exaggeration, and unusual conduct more than enough to create a question of fact concerning the legitimacy of its explanations for Peirick's termination.[4] The district court should not have granted the defendants' motion for summary judgment on Peirick's gender discrimination claim.[5]

---

[4] Additionally, the evidence that Moore, the decisionmaker in this case, treated men more favorably than women only bolsters Peirick's claim. Peirick testified that Moore would introduce male, but not female, coaches to dignitaries. The former women's basketball coach thought Moore was not sure how to "treat[ ] people as human beings, especially when it comes to the female gender." Linda Carroll, former Assistant Athletic Director and Senior Women's Administrator, found Moore's attitude toward women mean-spirited and discriminatory. She explained that "Moore rarely encouraged the women coaches or administration, but he always encouraged the men to perform better" and that "his expressions and body language expressed that he did not welcome conversations with female coaches." Further, she believed "Moore did not like women to be assertive" and, specifically, that he "did not want Ms. Peirick to be assertive or challenge him in any way." Finally, Carroll said she resigned from IUPUI because of Moore's gender-based treatment of her.

[5] Given our conclusion that summary judgment should not have been granted on Peirick's gender discrimination claim, we need not address her argument that it was error for the district court to reconsider its initial denial of summary judgment on her gender claim. But we briefly note that the district court was entitled to reconsider its initial denial of summary judgment, because the denial of summary judgment was simply an interlocutory order, which the district court had broad authority

(continued...)

**C.  Summary Judgment Was Proper On Peirick's Age Discrimination Claim, Because the Defendants Are Immune From Suit**

Peirick also charges IUPUI, the Athletics Department, and the Board of Trustees of Indiana University with violating the ADEA, which makes it unlawful for an employer to discriminate against an employee in the terms and conditions of her employment on the basis of age. 29 U.S.C. § 623(a)(1). Defendants counter that the Eleventh Amendment shields them from suit under the ADEA, and we agree. (They do not claim immunity from suit on Peirick's gender discrimination claim, because Congress "validly abrogated the States' Eleventh Amendment immunity with respect to Title VII disparate treatment claims." *Nanda v. Bd. of Trs. of the Univ. of Ill.*, 303 F.3d 817, 831 (7th Cir. 2002).

At the outset, we note that the Athletics Department is not a legal entity apart from the University. It is merely a division of the University that is not capable of being sued. *See Whiting v. Marathon County Sheriff's Dep't*, 382 F.3d 700, 704 (7th Cir. 2004) ("[T]he Marathon County Sheriff's Department is not a legal entity separable from the county government which it serves and is therefore, not subject to suit."); *West By & Through Norris v. Waymire*, 114 F.3d 646-47 (7th Cir. 1997) ("The naming of the Town's Police Department as a defendant adds nothing; it is almost certainly not a suable entity separate from the Town."). So we consider only whether IUPUI and the Board of Trustees of Indiana University enjoy Eleventh Amendment immunity.

---

[5]  (...continued)

to reconsider. *See Geffon v. Micrion Corp.*, 249 F.3d 29, 38 (1st Cir. 2001); *Cameo Convalescent Center, Inc. v. Percy*, 800 F.2d 108, 110 (7th Cir. 1986); *United States v. Acosta*, 669 F.2d 292, 293 (5th Cir. 1982).

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. Although the Amendment speaks of suits filed by citizens of another state, the Supreme Court "has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974) (internal citations omitted).

The Amendment usually bars actions in federal court against a state, state agencies, or state officials acting in their official capacities, *see Gossmeyer v. McDonald*, 128 F.3d 481, 487 (7th Cir. 1997), but three exceptions exist. First, a state may waive immunity by consenting to suit in federal court; second, Congress may abrogate the state's immunity through a valid exercise of its powers; third, under the *Ex parte Young* doctrine, a plaintiff may file "suit[] against state officials seeking prospective equitable relief for ongoing violations of federal law . . . ." *Marie O. v. Edgar*, 131 F.3d 610, 615 (7th Cir. 1997); *see Ex parte Young*, 209 U.S. 123, 159-60 (1908). Peirick does not contend that Indiana consented to suit in federal court. Her ability to resort to the second exception was cut short in *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 91 (2000), where the Court held that "in the ADEA, Congress did not validly abrogate the States' sovereign immunity to suits by private individuals." So only the *Ex parte Young* exception remains, and Peirick has not availed herself of that option.

Although Peirick requests only prospective injunctive relief, she has not brought suit against a state official. Indeed, Peirick cannot seriously dispute that IUPUI, a partnership between Indiana and Purdue Universities, is an agency of the state of Indiana. *See Woods v. Ind.*

*Univ.-Purdue Univ.*, 996 F.2d 880, 883 (7th Cir. 1993) (citing favorably *Shannon v. Bepko*, 684 F. Supp. 1465 (S. D. Ind. 1988), which held Indiana University and IUPUI to be agencies of the state); *see also Porco v. Trs. of Ind. Univ.*, 453 F.3d 390, 394-95 (7th Cir. 2006); *Kashani v. Purdue Univ.*, 813 F.2d 843, 844 (7th Cir. 1987). And, as explained below, the Board of Trustees of Indiana University is an agency of the state.

Many courts have held that the governing bodies of their state universities enjoy the same immunity from suit as the universities themselves. *See Richardson v. Southern Univ.*, 118 F.3d 450, 455 (5th Cir. 1997) ("Southern [University] and its Board are considered an agency of the State of Louisiana"); *Hall v. Hawaii*, 791 F.2d 759, 761 (9th Cir. 1986) (holding that the University of Hawaii and its board of regents "are clearly immune as agencies of the state"); *Harden v. Adams*, 760 F.2d 1158, 1164 (11th Cir. 1985) (noting that "the Board of Trustees of a state university is entitled to sovereign immunity as an instrumentality of the state"); *Cannon v. Univ. of Health Sciences/Chi. Med. Sch.*, 710 F.2d 351, 356 (7th Cir. 1983) (Southern Illinois University and the Board of Trustees of the University of Illinois are state agencies with Eleventh Amendment immunity); *Wellman v. Tr. of Purdue Univ.*, 581 F. Supp. 1228, n.1 (N.D. Ind. 1984) ("[F]or purposes of Eleventh Amendment immunity, no distinction can, should, or will be drawn between Purdue University and its Board of Trustees."); *see also Joseph v. Bd. of Regents of the Univ. of Wis. Sys.*, 432 F.3d 746, 748 (7th Cir. 2005) ("The [Wisconsin Board of Regents] is an 'arm of the state' for Eleventh Amendment purposes."). So it seems to follow that the Board of Trustees of Indiana University, like the university, is a state agency. And an examination of the factors relevant for determining whether an entity is an agency of the state leads to that exact conclusion.

In deciding whether an entity is an agency of the state, the most important factor is "the extent of the entity's financial autonomy from the state." *Kashani*, 813 F.2d at 845. That inquiry is composed of five subparts: (1) the extent of state funding; (2) the state's oversight and control of the entity's fiscal affairs; (3) the entity's ability to raise funds; (4) whether the entity is subject to state taxation; and (5) whether a judgment against the entity would result in an increase in its appropriations. *Id.* Beyond these financial considerations, we also consider the general legal status of the entity. *Id.* at 846-47. Where this factor is concerned, we prioritize substance over form. *Id.* at 847.

The Board has only limited financial autonomy. The Board holds and expends Indiana University's financial assets, *see* Ind. Code § 21-31-2-4 (2007), and a significant percentage of those assets are derived from the state. During the 2004-2005 academic year, for example, state appropriations accounted for 24% of Indiana University's revenue. *See* Indiana University Financial Report 2004-2005, *available at* http://www.indiana.edu/~vpcfo/fy2005.pdf (last visited Dec. 11, 2007). The state exercises substantial control over the Board's fiscal affairs and its ability to raise funds. In certain instances, the Board must gain the approval of the governor and the state's budget agency before issuing bonds, *see* Ind. Code § 21-35-2-21, or making capital expenditures, *see* Ind. Code § 21-35-2-20. Although the Board collects funds for the University from sources outside the state, it depends on the state's financial support. *See Kashani*, 813 F.2d at 846. Since that financial support is carefully allocated, a judgment against the Board would "affect the state treasury." *Id.* This becomes even more apparent given that the Board is authorized to employ officers, faculty, consultants, and counsel, *see* Ind. Code § 21-38-3-1, and to pay the fees that these persons incur as a result of their

employment or performance of duties for the school. *See* Ind. Code § 21-38-4-1.

The Board's general legal status similarly suggests an agency relationship. Specifically, the Indiana Code includes state boards and universities in the definition of state agencies. Ind. Code § 4-12-1-2. Moreover, the governor, the state's chief executive, necessarily has some control over the Board because six of the nine members of the Board are gubernatorial appointees. Ind. Code § 21-20-3-12 to 13; *see Kashani*, 813 F.2d at 847. We also find it significant that the Board, like Indiana University, serves the entire state. *See Kashani*, 813 F.2d at 847-48. Taken together, these factors lead us to conclude that the Board of Trustees of Indiana University is but an agency of the state, which operates the school under state oversight. *See Russell v. Tr. of Purdue Univ.*, 168 N.E. 529, 535 (Ind. 1929) (citing *Tucker v. Pollock*, 43 A. 369 (R.I. 1899) for the proposition that the Board of Managers of the Rhode Island College of Agriculture and Mechanic Arts "is but the agent of the state to carry out the purposes of the General Assembly in connection with the establishment and maintenance of the college."). As such, Peirick may not proceed against the Board even on her claims for prospective injunctive relief.[6] *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) ("[t]he doctrine of *Ex parte Young* . . . has no application in suits against the States and their agencies, which are barred regardless of the relief sought"); *Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 496 (10th Cir. 1998) ("[A]lthough the *Ex Parte Young* exception does not permit plaintiff to subject

---

[6] A different result may have obtained had Peirick sued individual members of the Board in their official capacities. *See Kashani*, 813 F.2d at 848.

[University of New Mexico School of Medicine], [and] its Regents . . . to suit because they are state agencies, plaintiff may maintain an action against the individual defendants in their official capacities . . . ."); *Wasserman v. Purdue Univ.*, 431 F. Supp. 2d 911, 916 (N.D. Ind. 2006) ("[T]he Board of Trustees [of Purdue University] is a political arm of the state which is immune to suit. [Plaintiff] did not name the individual members of the Board of Trustees, in their official or individual capacities. Because Purdue has not waived that immunity, the Eleventh Amendment precludes this court from exercising jurisdiction."). Because IUPUI and the Board are immune from suit, the district court's grant of summary judgment was proper.

### III. CONCLUSION

For the foregoing reasons, we VACATE the award of summary judgment in favor of IUPUI and the Board of Trustees of Indiana University on Peirick's gender discrimination claim. However, in light of IUPUI's and the Board's Eleventh Amendment immunity, we AFFIRM the grant of summary judgment in their favor on Peirick's claim of age discrimination.

No. 06-1538

A true Copy:

      Teste:


                      _____
                      *Clerk of the United States Court of*
                         *Appeals for the Seventh Circuit*