VAIDIK, Chief Judge,
dissenting.
[42] Mid-America was sued in tort by individuals claiming they were injured by Mid-America’s' negligent acts and omis *344 sions, which led to the tragic stage-roof collapse- at the 2011 Indiana State Fair. Mid-America’s position is that this is a contract matter: they allege that the Indiana State Fair Commission (the Commission) agreed-to indemnify Mid-America in “contracts” between the parties from 2003 onward.[8] The majority reverses the trial court’s grant of summary judgment in favor of the Commission, finding that there are genuine issues of material fact as to the validity and' enforceability of the indemnification clauses. ' Given that the purported indemnification clauses were located on the backside of unsigned invoices, I have serious doubts as to whether there was an enforceable contract between Mid-America and the Commission. But I respectfully dissent from the majority’s opinion because, taking substance over form, I believe that this case is nothing more than Mid-America’s attempt to shift tort liability to the Commission — -a tort in contract’s clothing, if you will. I would find that the Commission has immunity from Mid-America’s claims, against them since this is the type of action contemplated by the Indiana Tort Claims Act (ITCA) and the Commission is a governmental entity.
[43] Sovereign immunity developed in England as a common law doctrine founded on the substantive principle that “the king could do no wrong,” and encompassing the procedural notion that the king, as a sovereign, was not subject to being sued in his own court. State v. Rendleman, 603 N.E.2d 1333, 1335 (Ind.1992) (quoting Peavler v. Monroe Cnty. Bd. Of Comm’rs, 528 N.E.2d 40, 41 (Ind.1988) (citing Prosser & Keeton on Torts, § 131 at 1033 (5th ed. 1984))). The doctrine was carried over by courts in the United States and was long recognized in Indiana. See id. Then, in 1972, after years of increasing restrictions to the doctrine, our Supreme Court in Campbell v. State, 259 Ind. 55, 284 N.E.2d 733 (1972), abolished the doctrine of -sovereign immunity for the State in almost all tort cases. Oshinski v. N. Ind. Commuter Transp. Dist., 843 N.E.2d 536, 543 (Ind.Ct.App.2006). The Campbell Court explained that the legislature is primarily responsible for considering which instances of governmental conduct should be immunized from liability, and, in 1974, the General Assembly enacted the ITCA. Id.
[44] The ITCA governs tort claims against governmental entities and public employees and partially reinstated the sovereign immunity abolished by the Campbell Court. Oshinski, 843 N.E.2d at 543; see also Ind.Code § 34-13-3-1 et seq. Pursuant to the ITCA, governmental entities can be subjected to liability for tor-tious conduct unless the conduct is within an immunity granted by the ITCA. Oshinski, 843 N.E.2d at 543-44. The General Assembly created the ITCA in recognition of the principle that “it is the legislature, and not the courts, that is in the best position to determine the nature and extent to which- governmental units in Indiana should be insulated from tort liability.” Benton v. City of Oakland City, 721 N.E.2d 224, 232 (Ind.1999). The legislative purpose of the ITCA was to limit the financial responsibility of the State by restricting damages in tort in order- to protect the fiscal integrity of governmental bodies. In re Train Collision at Gary, Ind. on Jan. 18, 1993, 654 N.E.2d 1137, 1146 (Ind.Ct.App.1995), reh’g denied
*345 [45] Most relevant to this case, the ITCA provides, “A governmental entity, or an employee acting within the scope of the employee’s employment is not liable if a loss results from ... [t]he act or omission of anyone other than the governmental entity or the governmental entity’s employee.” Ind.Code § 34-13-3-3(10). Regarding this subsection, our Supreme Court has stated that it provides immunity in certain cases wherein governmental liability could otherwise occur, “but that this immunity exists only when the alleged governmental liability is grounded upon the acts or omissions of persons other than the government employee acting within the scope of the employee’s employment.” Hinshaw v. Bd. of Comm’rs of Jay Cnty., 611 N.E.2d 637, 640 (Ind.1993). Although the Hinshaw Court construed this portion of the statute to apply to actions seeking to impose vicarious liability on governmental entities and employees by reason of conduct of third parties, it applies equally to the situation we have here, where Mid-America seeks to hold the Commission liable, not for the acts or'omissions of the Commission, but for the acts or omissions of Mid-America.
[46] The ITCA specifically states that it applies only to tort claims; I would find this to be a tort claim. Treating this as a contract matter disregards Subsection 10. See Hinshaw, 611 N.E.2d at 638 (“[I]n construing a statute, we will presume that the legislature did not enact a useless provision.”). Furthermore to allow a government employee to enter into a contract— by course of dealing or otherwise — with the terms of that contract being that the governmental entity will assume the tort liability of another party frustrates the entire purpose of the ITCA. See Benton, 721 N.E.2d at 232.
[47] The bottom line is this: the legislature alone decides when State entities can and will be subject to suit. See Oshinski, 843 N.E.2d at 543; see also Raygor v. Regents of the Univ. of Minn., 534 U.S. 533, 543, 122 S.Ct. 999, 152 L.Ed.2d 27 (2002) (“[A] State ‘may prescribe the terms and conditions on which it consents to be sued.’”). Moreover, a state may not be sued in its own courts unless it has waived its sovereign immunity by expressly consenting .to such suit through a clear declaration of that consent. Oshinski, 843 N.E.2d at 539-40 (quotation omitted). As such, the Commission could .not expose itself to tort or contract liability under these facts even if it wanted to — and that is by design. Otherwise, as the Commission points out, “the legislature’s critical role in protecting [S]tate funds from exposure to unlimited liability would be completely undermined.” Appellee’s Br. p. 36; see also In re Train Collision, 654 N.E.2d at 1146; Thompson v. State, 425 N.E.2d 167 (Ind.Ct.App.1981) (“We conclude then that the object of the Tort Claims Act ... is to protect the fiscal integrity of governmental entities by limiting their liability ... for damages in tort.”), reh’g denied.[9]
[48] And, although the majority did not reach this issue, it is clear that the Commission is a governmental entity. Indiana Code section 34-6-2-49 defines “governmental entity” for purposes of the ITCA as follows: “ ‘Governmental entity[,]’ for pur *346 poses of ... IC 34-13-3, ... means the state or a political subdivision of the state.” Indiana Code section 15 — 13—2—1 (b) provides that the Commission:
(1) is a separate body, corporate and . politic;
(2) is not a state agency; and
(3) performs essential governmental functions.
Although according to Section 15-13-2-1, the Commission is “a separate body, corporate and politic” and “not a state agency,” it is nonetheless a “governmental entity” because it operates as an entity of the State.
[49] In support of this conclusion, one need only look to the statutes of Indiana Code section 15-13-1-1 et seq., which govern -the State -Fair' and the Commission. Most significantly, under Section 15-13-2-1, the Commission was established by the State to “perform! ] esséntial governmental functions." Ind.Code § 15-13-2-1(b)(3) (emphasis 'added). Five of the eight members of the Commission are appointed by the 'governor. Ind.'Code § 15-13-2-2(a)(l). Commission vacancies are filled by individuals appointed by the governor. Ind.Code § 15-13-2-4(a). The Commission is mandated to maintain, develop, and administer the fairgrounds and other property owned by the Commission “to provide for maximum use of the fairgrounds and property of the [Commission for the benefit of the citizens.of Indiana.” Ind.Code §§ 15-13-3-1, -2. The Commission holds the state fairgrounds in trust for the state, cannot dispose of any part of the fairgrounds unless authorized by statute, and cannot dispose of any real property without the governor’s consent. Ind. Code §§ 15 — 13—4—2, -3. The fairgrounds and property of the Commission are exempt from state and local taxes, license fees, and special assessments. Ind,Code § 15-13-4-4. And at the close of a fiscal year, the Commission is required to submit an annual report setting forth a complete operating and financial statement of the preceding year to the governor, budget committee, and General Assembly. Ind. Code § 15-13-3-10.
[50] The State Fair Fund, which is administered by the Commission, is also controlled by statute. The Fund consists of, among other things, property-tax revenue and appropriations made by the General Assembly. Ind.Code § 15-13-8-3, The money in the Fund is subject to allotment under Indiana Code section 4-13-2-18, the statute governing appropriations and administration of the allotment system. Ind. Code § 15-13-8-7. And the state treasurer invests the Fund money in the same manner as other public funds may be invested. Ind.Code , § 15-13-8-4. From these governing statutes it is clear that the State has significant involvement in and oversight of the Commission’s fiscal affairs.
[51] Although federal law is not, of course, controlling in this matter, it is nonetheless instructive in providing guidance in our analysis of the Commission’s status as a state entity. Under federal law, the question of whether an entity is an “arm of the state” for purposes of Eleventh Amendment immunity turns largely on two factors: (1) the extent of the entity’s financial autonomy from the state and (2) the “general legal status” of the entity. Kashani v. Purdue Univ., 813 F.2d 843, 845-47 (7th Cir.1987). Of the two, the entity’s financial autonomy is the “most important factor.” Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep’t, 510 F.3d 681, 695 (7th Cir.2007). In making this assessment, courts consider: (1) the extent of state funding; (2) the state’s oversight and control of the entity’s fiscal affairs; (3) the entity’s ability to raise funds; (4) whether the entity is sub *347 ject to state taxation; and (5) whether a judgment against the entity would result in an increase in its appropriations. Id. at 696. . ,
[62] From the statutes governing the Commission, Indiana Code section 15 — 18— 2-1 et seq., we know that the Commission receives state appropriations made by the General Assembly; that the Commission is required to submit an annual report to the governor, budget committee, and the General Assembly; and that the Commission administers'the State Fair Fund, which consists of property-tax revenue, appropriations made by the General Assembly, interest accrued from the investment of Fund money, and certain proeeeds 'from the operation of the fair. See I.C. §§ 15-13-3-10, 15-13-8-3, -7. Moreover, the Commission 'can' issué revenue bonds, but only with the governor’s consent, and only for the limited purposes of funding projects or refunding outstanding revenue bonds. See Ind.Code §§ 15-13-10-3, -4. As to the question of where the funds to cover tort-claim damages would come from, Mid-America in its reply brief cites Indiana Code section 15-13-2-14: “The [C]ommission shall pay the expenses of the [Commission from the money of the [C]ommission, including the [State. Fair] [F]und.”[10] But Mid-America ignores the fact that the State Fair Fund itself relies upon state appropriations. See I.C. § 15-13-8-3. Therefore, it is clear that the Commission is not financially autonomous from the State. •
[53] As to the second factor — the entity’s “general legal status” — the federal courts “prioritize substance over form.” Peirick, 510 F.3d at 696. Here, as discussed above, the statute establishing the Commission provides that the Commission is “a separate body, corporate and .politic” and “not a state agency,” but the statutes discussed above clearly support the conclusion that the Commission ‘is a state and governmental entity. Primarily, the Commission was established to “perform essential governmental functions.” I.C. § 15-13-2-1. Five of the eight members of the Commission are gubernatorial' appointees. I.C. § 15-13-2-2. Moreover, the Commission serves' the entire state, as its primary responsibility is to maintain, develop, and administer the fairgrounds “for the benefit of the citizens of Indiana.” I.C. §§ 15 — 13— 3-1, -2. Indeed, under Indiana» Code section 15-13-4-2, the Commission holds the fairgrounds in trust for the Stg>te. I would conclude that the Commission’s general legal status is that of a state entity. See Peirick, 510 F.3d at 696.
[54] Thus, prioritizing substance over form, I would find that the .Commission is immune from Mid-America’s indemnity claim under' the ITCA; accordingly, I would affirm the trial court’s grant of summary judgment in favor of The Commission.

. Specifically, in their third-party complaint for indemnification, Mid-America asserted as follows:
[] Pursuant to Rule 14 of the Indiana Trial Rules, Mid-America, as third-party claimant, brings this claim against the State Fair Commission to protect and secure its rights to defense and indemnification under the contracts existing between the parties.
Appellant’s App. p. 1006.

. Indeed, the General Assembly, through legislation, created a "supplemental state fair relief fund” of six million dollars above the ITCA caps to provide additional relief for the victims of the stage-collapse occurrence. See Ind.Code § 34-13-8-3. Not the Governor, the Attorney General, or any other employee of the State had the-power to consent to state liability above the limits of the ITCA. Giyen this, it makes little sense that a Commission employee(s) can waive tort immunity by submitting claim forms and unsigned Mid-America invoices to the Commission.'

. In its reply brief, Mid-America references a 1991 press release by the Attorney General, in which it is "opined that debts of the Commission are to be paid from the State Fair Fund and that ‘there is no recourse against the state and its general fund....”’ Appellant’s Reply Br. p. 19. This press release was drafted in response to the question of whether "[w]ith regards to quasi-state agencies,” the State — which "creates these agencies as-well as partially funds them” — would be obligated or liable in case of default on their part. See Ind Op. Att’y Gen. No. 10 (1991).